# EXHIBIT D

Not Reported in F.Supp.2d
RICO Bus.Disp.Guide 10,790
(Cite as: 2004 WL 2809989 (S.D.N.Y.))

United States District Court,
S.D. New York.

**Dale SOBEK and Seema Bhagat, Plaintiffs,**
v.
**Joseph QUATTROCHI, Cardinal Capital
Management, Inc., R & M Capital Partners,
Inc., Power2Ship, Inc., and Madison Stock
Transfer, Inc., Defendants.**

**No. 03 Civ.10219(RWS).**

Dec. 8, 2004.

Fischer Law Firm, New York, NY, By: Michael
Andrew Fischer, for Plaintiffs, of counsel.

Davis & Gilbert, New York, NY, By: Brian H.
Rubenstein, for Defendant Cardinal Capital
Management, of counsel.

Gusrae, Kaplan & Bruno, New York, NY, By:
David A.A Gehn, for Defendant Power2Ship, Inc.,
of counsel.

Marshal Schichtman & Associates, Carle Place,
NY, By: Marshal Schichtman, for Defendant
Madison Stock Transfer, of counsel.

OPINION

SWEET, J.

*1 Defendant Cardinal Capital Management, Inc.
("Cardinal") has moved under Rule 12(b)(6),
Fed.R.Civ.P., to dismiss the complaint of plaintiffs
Dale Sobek ("Sobek") and Seema Bhagat ("Bhagat")
and alternatively under Rule 12(e), Fed.R.Civ.P.,
for a more definite statement, and to compel
arbitration. Defendant Power2Ship, Inc. ("P2S") has
moved similarly to dismiss the complaint and for a
more definite statement. Plaintiffs have opposed
these motions, and they have moved for leave to file
an amended complaint. For the reasons set forth
below, the motions to dismiss are granted, and the
motion to file an amended complaint is granted in
part and denied in part.

Prior Proceedings

Sobek and Bhagat filed their complaint on

December 24, 2003, alleging: (1) breach of an
alleged stock purchase agreement with each of the
plaintiffs, (2) a violation of 18 U.S.C. § 1962 et
seq. (Civil RICO/Money Laundering), (3) and a
claim for punitive damages. On March 15, 2004,
Cardinal and P2S moved to dismiss the complaint
and, in the alternative, for a more definite statement,
and to compel arbitration. Oral arguments on the
motion were heard on April 28, 2004.

On June 18, 2004, Sobek and Bhagat submitted an
order to show cause to amend the complaint, which
was denied by the Honorable Deborah A. Batts,
who was sitting in Part One. Judge Batts advised
Sobek and Bhagat to proceed by regular motion
practice to seek leave to amend the complaint.
[FN1] Plaintiff's motion to file an amended
complaint was opposed by Cardinal, P2S, and
Madison Stock Transfer, Inc. ("Madison"). The
motion for leave to file an amended complaint was
marked fully submitted without oral argument on
July 28, 2004.

> FN1. Judge Batts also advised the plaintiffs to
> submit a motion on notice to stay the submitted
> motions to dismiss pending the filing of the
> amended complaint. However, the plaintiffs failed
> to make any such motion.

Facts

According to the complaint, separate stock
purchase agreements ("SPA") with R & M were
entered into by the plaintiffs with defendant R & M
Capital Partners ("R & M").

On May 16, 2002, Sobek negotiated a stock
purchase agreement ("SPA") with R & M pursuant
to which Sobek purchased 240,000 shares of Jaguar
Investments, Inc.  ("Jaguar") from R & M for
$120,000, or $ .50 per share. The SPA is alleged to
have contained a provision whereby Sobek could
immediately "put" the subject shares back to R & M
at a value of $1.50 per share, or $360,000 (the "Put
Option"). In addition, R & M is alleged to have
pledged to Sobek 500,000 restricted shares of Jaguar
stock (the "Collateral Shares") in order to
collateralize R & M's obligations to Sobek under the
SPA.

According to the complaint, in July 2002,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 2809989, *1 (S.D.N.Y.))

approximately two months after entering into the SPA, Sobek sought to exercise his Put Option and demanded payment of $360,000, which was not forthcoming. Thereafter, Sobek unsuccessfully attempted to sell the Collateral Shares.

Bhagat has alleged that at some unspecified time she entered into an unspecified agreement with unspecified parties in order to purchase 50,000 Jaguar shares at a cost of $100,000 ($2.00 per share), which were the subject of an unspecified Put Option. Further, Bhagat alleges that at an unspecified time she unsuccessfully attempted to exercise her unspecified Put Option with unspecified parties. Bhagat, unlike Sobek, does not allege that her unspecified SPA was collateralized by Jaguar shares.

*2 The only allegation contained in the complaint against P2S appears in paragraph 23 where it is alleged upon information and belief [FN2] that P2S had knowledge that co-defendant Madison Stock Transfer, Inc. ("Madison") facilitated the transfer of the Collateral Shares. [FN3]

> FN2. Plaintiffs fail to state the basis of such information and belief.

> FN3. Significantly, no facts are pled in the complaint indicating that Madison or P2S even knew the plaintiffs, much less that Madison or P2S knew of the existence of the alleged SPA, Put Option, or the Collateral Shares.

Discussion

A. Diversity Jurisdiction

In a diversity action, a New York district court, "look[s] to the choice-of-law rules of New York" to determine which state's law should be applied to the issues of substantive law. See, e.g., Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir.1987). Since the parties have applied New York law, it is assumed, at least for the purpose of these motions, that New York law applies.

B. The Motions to Dismiss the Complaint

The motions of Cardinal and P2S to dismiss the complaint are granted in their entirety.

1. The 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir.2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir.2000); accord Eternity Global Master Fund, 375 F.3d at 176-77.

The Court may properly consider any documents referred to in the complaint, whether explicitly or by reference, on a motion to dismiss. Gregory, 243 F.3d at 691; Stuto v. Fleishman, 164 F .3d 820, 826 n.1 (2d Cir.1999). While the Court must accept the allegations in the complaint as true, to the extent any allegations directly contradict evidence contained in the documents relied upon by a plaintiff, the documents control, and the allegations need not be accepted as true. Rozsa v. May Davis Group, Inc., 187 F.Supp.2d 123, 128 (S.D.N.Y.2002).

2. The Breach of Contract Claims Are Dismissed

*3 The plaintiffs have not alleged that Cardinal or P2S are parties to any contract with either of them. Although Sobek alleges that the SPA was signed by defendant Joseph Quattrochi ("Quattrochi") on behalf of Cardinal, such allegation is belied by the



Not Reported in F.Supp.2d                                              **Page 15**
(Cite as: 2004 WL 2809989, *3 (S.D.N.Y.))

language of the complaint and the contracts, which state that Quattrochi signed on behalf of R & M and not Cardinal.

The key elements of a breach of contract claim are: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. Posner v. Minnesota Mining & Mfg. Co., 713 F.Supp. 562, 563 (E.D.N.Y.1989). A complaint in a breach of contract action must at least set forth the terms of the agreement upon which liability is predicated. Mayes v. Local 106, Int'l Union of Operating Eng'rs, 739 F.Supp. 744, 748 (N.D.N.Y.1990); Chrysler Capital Corp. v. Hilltop Egg Farms Inc., 129 A.D.2d 927, 928, 517 N.Y.S.2d 1002, 1003 (3d Dep't 1987) (complaint must "set forth the terms of the agreement upon which liability is predicated, either by express reference to or by attaching a copy of the contract."). Pursuant to New York law, plaintiffs' claims for breach of contract must allege the terms of the contract, each element of the alleged breach and the resultant damages. Kaplan v. Aspen Knolls Corp., 290 F.Supp.2d 335, 337 (E.D.N.Y.2003); see also Griffin Bros. Inc. v. Yatto, 68 A.D.2d 1009, 1009, 415 N.Y.S.2d 114, 114 (3d Dep't 1979). The complaint does not satisfy these pleading requirements with respect to Cardinal or P2S.

The relevant stock purchase agreement for Sobek indicates on its face that neither Cardinal nor P2S was a party, nor were their names mentioned in the agreements. Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir.1985) (stating that a non-signatory to a contract cannot be bound by the contract if the signing party is not the non-signatory's agent). The complaint indicates that the Bhagat contract is "similar," but that it involves a different number of Jaguar shares. (Compl.¶ 15). Although the plaintiffs allege that Quattrochi was an employee of Cardinal, the SPA itself makes clear that Quattrochi signed the contracts on behalf of R & M and not on behalf of Cardinal or P2S. Since the terms of the agreements contradict the allegations contained in the complaint, the agreement control. See, e.g., Rozsa, 187 F.Supp.2d at 128.

Since neither Cardinal nor P2S were parties to any of the contracts at issue, plaintiffs have failed to plead a breach of contract cause of action against

them.

### 3. The RICO Claims Are Dismissed

The Private Securities Litigation Reform Act ("PSLRA") prohibits RICO claims based on allegations of fraud in connection with the purchase or sale of securities. The applicable provision of the PSLRA is codified at 18 U.S.C. § 1964(c), which states:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

*4 In amending RICO, Congress was clear in stating that the PSLRA " 'was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim." ' Jordan (Berm.) Inv. Co., Ltd. v. Hunter Green Invs., Ltd., 205 F.Supp.2d 243, 248 (S.D.N.Y.2002) (internal citations omitted); see also ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F.Supp. 1308, 1319 (S.D.N.Y.1997) (legislative history was "unequivocal in stating that where allegations of mail and wire fraud derive from conduct otherwise actionable as securities fraud, no RICO claim will lie"); Krear v. Malek, 961 F.Supp. 1065, 1074 (E.D.Mich.1997) ("It is abundantly clear that Congress intended that conduct constituting wire and mail fraud not form the basis of a predicate act under the amendment if such conduct would also be actionable as securities fraud").

Any conduct plaintiffs allege on behalf of Cardinal and P2S arose out of the alleged contracts entered into by plaintiffs. The alleged contracts themselves involved the purchase of securities, i.e., common stock of Jaguar. The PSLRA therefore precludes plaintiffs from asserting any RICO claims against Cardinal or P2S.

In addition, plaintiffs have failed to plead the requisite elements of a RICO claim with particularity. This Court recently noted in Lesavoy



Not Reported in F.Supp.2d
(Cite as: 2004 WL 2809989, *4 (S.D.N.Y.))

v. Lane, 304 F.Supp.2d 520, 532 (S.D.N.Y.2004)
that:

"RICO is a specialized statute requiring a particular configuration of elements. These elements cannot be incorporated loosely from a previous narration, but must be tightly particularized and connected in a complaint." Parroting statutory language while generally referring the reader back to the previous 100 paragraphs in a complaint is inadequate.
Id. at 532 (citation omitted).

In order to claim that there has been a violation under §§ 1962(b) and 1962(c), a plaintiff must allege at least two predicate acts, and those acts must constitute a "pattern" of racketeering activity. See Moss v. Morgan Stanley, Inc., 719 F.2d 5, 18 (2d Cir.1983). A pattern must be established by showing that the defendants' acts are "related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). In considering whether the plaintiffs have met the continuity requirement, it must be determined "which predicate acts were pled with the requisite particularity and what timeframe those acts can be said to span." CPF Premium Funding, Inc. v. Ferrarini, No. 95 CIV 4621(CSH), 1997 WL 158361 at *7 (S.D.N.Y. Apr. 3, 1997).

Here, plaintiffs have not pled any predicate acts, nor have they pled any pattern, let alone one with the requisite degree of specificity. In order to sufficiently plead a RICO claim, a plaintiff must plead "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity." Cyber Media Group, Inc. v. Island Mortgage Network, Inc., 183 F.Supp.2d 559, 578 (E.D.N.Y.2002) (quoting Sedima, S.P.L.R. v. Imrex Co., 473 U.S. 479, 496 (1985)). The complaint does not allege that Quattrochi was acting on behalf of Cardinal. The allegation that Quattrochi was an employee of Cardinal fails to satisfy the pleading requirement for a cause of action under RICO.

*5 Sobek by affidavit has stated that the stock at issue in this case was "transferred to a stock brokerage account at Cardinal" and that "Cardinal ... indicated that these shares had been transferred to another shareholder/investor." See Affidavit of Dale Sobek, sworn to April 16, 2004 (the "Sobek Aff.") at ¶¶ 8, 10. As discussed below, the Court should

not consider these arguments at all. The plaintiffs also allege for the first time in their memorandum of law that defendant Quattrochi "raised money through the 'Put Option' and 'Collateral Provision' to benefit, among other parties, Cardinal" and that Cardinal had a monetary interest in the Jaguar investments. (See Plaintiffs' Memorandum of Law in Opposition to Cardinal's Motion to Dismiss at II(B)(1) and II(B)(3).)

Additional facts submitted in a plaintiff's opposition to a motion to dismiss cannot be considered by the Court. See Padilla v. Payco Gen. Am. Credits, Inc., 161 F.Supp.2d 264, 267 (S.D.N.Y.2001) ("[I]t is axiomatic that the complaint cannot be amended by the briefs in opposition to a motion to dismiss [.]") (quoting O'Brien v. National Prop. Analysts Partners, 719 F.Supp. 222, 229 (S.D.N.Y.1989); Citadel Mgmt. Inc. v. Telesis Trust, Inc., 123 F.Supp.2d 133, 147, n.3 (S.D.N.Y.2000) (same). Even if these allegations are considered and accepted as true, however, none of these additional allegations involve any active conduct on behalf of Cardinal. The plaintiffs have not pled an act of racketeering (mail fraud, wire fraud, etc.) undertaken by Cardinal or P2S, let alone conduct of an enterprise through a pattern of racketeering.

Sobek and Bhagat seek to save their RICO claim by stating that the PSLRA "is not applicable to the case at bar" because this is not a class action. (See Plaintiffs' Memorandum of Law in Opposition to Cardinal's Motion to Dismiss at II(B)(2)). While it is true that one of the purposes of the PSLRA was to remedy abusive class actions in securities fraud cases, it is well settled in this district that the PSLRA is not limited to class actions. See Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc., 985 F.Supp. 427, 430 (S.D.N.Y.1997), rev'd on other grounds, 186 F.3d 157 (2d Cir.1999) ("[T]here is nothing in the legislative history which indicates that the phrase 'in any private action' ... was intended to be limited to 'class actions'...."); Inter-County Res., Inc. v. Medical Res., Inc., 49 F.Supp.2d 682, 684 (S.D.N.Y.1999) (stating that the PSLRA extends to all securities fraud cases, and "not merely to class actions"). The PSLRA precludes plaintiffs from asserting a RICO claim.

Accordingly, plaintiffs' RICO violation claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 2809989, *5 (S.D.N.Y.))

against Cardinal and P2S should be dismissed in their entirety.

### 4. The Punitive Damage Claim Is Dismissed

Sobek and Bhagat have asserted a cause of action for punitive damages. However, no separate cause of action for such relief exists. Golden First Mortgage Corp. v. Berger, 251 F.Supp.2d 1132, 1141 (E.D.N.Y.2003) (stating that no separate cause of action for punitive damages exists).

*6 Moreover, punitive damages are not available under New York law for breaches of contract unless: (1) the defendant's conduct is actionable as an independent tort, (2) the conduct is egregious in nature, (3) the egregious conduct is directed at the plaintiff, and (4) the conduct is part of a pattern directed at the public generally. See New York Marine & Gen. Ins. Co. v. Tradeline (L .L.C.), 266 F.3d 112, 130 (2d Cir.2001) (stating that punitive damages for a breach of contract claim are not available if such claim is not properly plead). No such facts have been alleged in the complaint. Therefore, the punitive damages claim is dismissed as to Cardinal and P2S.

In addition, in an attempt to support their fraud claim, the plaintiffs' opposition papers for the first time state the following, which is not in the complaint: "Jaguar Investments receiv[ed] proceeds from the Plaintiffs in the amount of $170,000." (Plaintiffs' Memorandum of Law in Opposition to P2S' Motion to Dismiss at II(B)(2)). Likewise, the plaintiffs state the following which is not in the complaint: "Jaguar Investments received significant financial remuneration for selling these purported 'Put Options' and 'Collateral Provision' to the Plaintiffs." (Id. at II(B)(3)). Since such allegation are not stated in the complaint, they cannot be considered in connection with this motion, which is addressed solely to the sufficiency of the complaint.

### 5. The Conversion Claim Against P2S Is Dismissed

"Under New York law, ... a 'denial or violation of the plaintiff's dominion, rights, or possession, is the basis of an action for conversion." ' In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir.1993) (quoting Sporn v. MCA Records, Inc., 58 N.Y.2d 482, 487, 462 N.Y.S.2d 413, 415, 448 N.E.2d

1324, 1326 (1983)). Plaintiffs allege that R & M Capital illegally transferred 500,000 shares of Jaguar stock (Compl.¶ 22), and that Jaguar and P2S participated "maliciously" in this "unauthorized exercise of dominion." (Compl.  ¶ 35). P2S seeks dismissal on the grounds that plaintiffs have failed to state the conversion claim with requisite particularity pursuant to Fed.R.Civ.P. 9(b). Plaintiffs have not opposed P2S' motion for dismissal of this conversion claim. However, dismissal is more properly granted on the grounds that the complaint fails to allege that P2S (1) owned the shares in question or (2) acted in concert with R & M to improperly transfer the shares. Since such facts have not been properly alleged, the conversion claim is dismissed.

### 6. Bhagat's Claims Are Independently Deficient and This Court Is Without Jurisdiction

Plaintiffs' opposition papers make clear that Bhagat's claims are independently deficient and without this Court's jurisdiction. The basis of Bhagat's claims is set forth in paragraphs 15 and 20 of the complaint. Paragraph 15 of the complaint globally alleges in relevant part that "Bhagat entered into a similar agreement with the defendants buying 50,000 shares of Jaguar Stock for $100,000 subject to a put option similar to that negotiated by Plaintiff Sobek." [FN4] Paragraph 15 of the complaint generically states that "Bhagat has also attempted to exercise her Put option rights but has been unsuccessful."

> FN4. Bhagat impermissibly lumps all of the defendants together without good faith basis. However, the Bhagat stock purchase agreement represents a separate contract entered into between her and R & M for separate consideration from the Sobek stock purchase agreement. Notably, P2S is not a party to either agreement.

*7 In their papers, the plaintiffs include a copy of Bhagat's Stock Purchase Agreement with R & M (the "Bhagat SPA"). As evidenced by the actual document, the SPA is a contract executed by and between Bhagat and R & M. In addition, the Bhagat SPA contains no "put right." Contrary to the statement at paragraph 15 of the complaint that "Bhagat entered into a similar agreement with the defendants buying 50,000 shares of Jaguar Stock for $100,000," the Bhagat SPA concerned a purchase of

Not Reported in F.Supp.2d
(Cite as: 2004 WL 2809989, *7 (S.D.N.Y.))

100,000 shares of Jaguar Stock for $50,000.

Jurisdiction in this Court is predicated solely on diversity (see Compl. ¶ 1), requiring a matter in controversy exceeding the sum or value of $75,000, exclusive of interest and costs. 28 U.S .C. § 1332(a).

Plaintiffs concede that the controversy here derives from separate agreements entered into by Sobek and Bhagat "each individually.' (Plaintiffs' Memorandum of Law in Opposition to Cardinal's Motion to Dismiss at I). Bhagat's claim thus cannot rest on Sobek's claim in order to satisfy the monetary threshold for diversity jurisdiction. See, e.g., Arnold v. Troccoli 344 F.2d 842, 846 (2d Cir.1965) (stating that in diversity action, each plaintiff must individually claim the requisite jurisdictional amount), Miller v. European Amer. Bank, 921 F.Supp. 1162, 1167 (S.D.N.Y.1996) (citing Zahn v. International Paper Co., 414 U.S. 291 (1973)).

C. Plaintiffs' Motion to Amend

The proposed amended complaint ("PAC") asserts seven causes of action against the defendants: (1) violation of 18 U.S.C. § 1962, (2) fraudulent inducement, (3) breach of contract, (4) breach of covenants of good faith and fair dealing, (5) breach of fiduciary duty to shareholders (P2S only), (6) unjust enrichment, and (7) conversion.

1. Standard for Granting Leave To Amend

In general, leave to replead is "freely given when justice so requires." Fed.R.Civ.P. 15(a); see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991); Branum v. Clark, 927 F.2d 698, 705 (2d Cir.1991). However, a district court has discretion to deny leave to amend "where the application is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant." BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F.Supp.2d 123, 132 (S.D.N.Y.1999) (citing MacDraw, Inc. v. CIT Group Equip, Fin., Inc., 157 F.3d 956, 962 (2d Cir.1998). The Second Circuit has stated that "[m]ere delay, ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d

843, 856 (2d Cir.1981). Here the defendants Cardinal, P2S, and Madison have failed to make the combined showing of undue delay and bad faith and/ or undue prejudice necessary to justify denial of plaintiffs' motion for leave to amend.

Cardinal and P2S argue that the claims asserted against them in the PAC should be dismissed on the grounds that such claims are futile. "[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile." Ellis v. Chao, 336 F.3d 114, 126 (2d Cir.2003) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). A proposed amendment to a pleading is deemed to be futile if "it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir.2003) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir.1991)). For the purposes of evaluating futility, the 12(b)(6) standard is applied: All well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993).

2. The RICO Claim Is Futile As To Cardinal and R2S

*8 The PAC's first cause of action asserts RICO claims (18 U.S.C. § 1962) against the defendants. For the reasons set forth above (i.e ., (1) that 18 U.S.C. § 1964(c) forecloses assertion of RICO claims based on fraud in the purchase or sale of a security and (2) that plaintiffs have failed to plead the elements of a RICO claim), this first cause of action is futile as Cardinal and R2S.

3. The Breach of Contract Claim is Futile as to Cardinal and P2S

The PAC's second cause of action asserts breach of contract claims. However, the PAC does not cure the failure to properly alleged the existence of a contract between the plaintiffs and either Cardinal or P2S. Therefore, the second cause of action is futile as to Cardinal and P2S.

4. The Fraudulent Inducement Claim Is Futile as to Cardinal and P2S

The PAC's third cause of action alleges that the defendants fraudulently induced the plaintiffs to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 2809989, *8 (S.D.N.Y.))

enter into the SPAs. Under New York law, a fraud cause of action generally does not arise where the alleged fraud merely relates to a breach of contract. Salvador v. Uncle Sam's Auctions & Realty, Inc. ex rel. Passonno, 307 A.D.2d 609, 611, 763 N.Y.S.2d 360, 362 (3d Dep't 2003); River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp., 295 A.D.2d 274, 275, 743 N.Y.S.2d 870, 871 (1st Dep't 2002); Bazerman v. Edwards, 295 A.D.2d 115, 742 N.Y.S.2d 822 (1st Dep't 2002).

However, this general rule is subject to the corollary that "a party who has breached a contract may be charged with separate tort liability for fraud arising from a breach of duty that is distinct from, or in addition to, the breach of contract." 60A N.Y. Jurisprudence § 7 (citing Freedman v. Pearlman, 271 A.D.2d 301, 304 706 N.Y.S.2d 405, 408 (1st Dep't 2000); Licette Music Corp. v. A.A. Records, Inc., 196 A.D.2d 467, 601 N.Y.S.2d 297, 297-98 (1st Dep't 1993); Bernstein v. Polo Fashions, Inc., 55 A.D.2d 530, 531, 389 N.Y.S.2d 368, 370 (1st Dep't 1976)). In particular, it is well established that a misrepresentation of present fact which is the inducement for a contract is collateral to said contract, and can support a separate fraud claim. See, e.g., Primavera Familienstiftung v. Askin, 130 F.Supp.2d 450, 491, reconsidered on other grounds, 137 F.Supp.2d 438 (S.D.N.Y.2001) (stating that "a false representation that induces one to enter into a contract supports a fraud claim"); First Bank of Americas v. Motor Car Funding, 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21 (1st Dep't 1999) ("[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty.").

In the PAC, the plaintiffs fail to allege any misrepresentations on the part of Cardinal or P2S other than those allegedly contained in the SPAs or the Collateral Provisions. Therefore, the PAC's third cause of action is futile as to Cardinal and P2S.

5. The Breach of the Covenant of Good Faith and Fair Dealing Claim Is Futile as to Cardinal and P2S

*9 The PAC's fourth cause of action alleges breach of an implied covenant of good faith and fair dealing. Such a claim can only arise out of a contractual relationship. See, e.g., Alter v. Bogoricin, No. 97 Civ. 0662(MBM), 1997 WL

691332 at *7 (S.D.N.Y. Nov. 6, 1997). Since plaintiffs have failed to allege the existence of a contractual relationship with either Cardinal or P2S, this claim is futile as to those defendants.

6. The Unjust Enrichment Claim Is Futile as to Cardinal and P2S

The PAC's fifth cause of action alleges unjust enrichment. In order to state a claim for unjust enrichment, plaintiffs must allege (1) that a benefit was conferred on the defendant, (2) that the defendant received the benefit without adequately compensating the plaintiffs, and (3) that circumstances are such that equity requires that the defendant make restitution. See, e.g., National Westminster Bank plc v. Grant Prideco, Inc., 261 F.Supp.2d 265, 275 (S.D.N.Y.2003). The PAC fails to allege that the plaintiffs conferred any benefit on either Cardinal or P2S. Rather, plaintiffs merely make a blanket assertion that the defendants were unjustly enriched. Therefore, the fifth cause of action is futile as to Cardinal and P2S.

7. The Breach of Fiduciary Duty Claim Is Futile as to P2S

The PAC's sixth cause of action asserts a breach of fiduciary duty claim against P2S on the theory that P2S allowed "the Subject Shares and the Collateral Shares ... to be transferred to other purported purchasers." (PAC ¶ 83). However, the PAC contains no allegations as to the nature of the duty that P2S owed to the plaintiffs and what acts P2S took in violation of that duty. Therefore, the sixth cause of action is futile.

8. The Conversion Claim Is Futile as to Cardinal and P2S

The PAC's seventh cause of action alleges conversion by all of the defendants. As set forth above, for the purpose of stating a conversion claim, plaintiff must allege that the defendant engaged in a denial or violation of the plaintiff's dominion, rights, or possession of property. See In re Chateaugay Corp., 10 F.3d at 957. In the PAC, plaintiffs have done no more than assert conclusory allegations that defendants exercised unauthorized dominion over the 500,000 Jaguar shares. (PAC ¶ 95). Such conclusory allegations are inadequate to state a claim for conversion. Therefore, the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.2d
**(Cite as: 2004 WL 2809989, *9 (S.D.N.Y.))**

conversion claim is futile with respect to Cardinal and P2S.

9. Bhagat's Claims Are Independently Deficient and This Court is Without Jurisdiction

The PAC does not provide any basis for concluding that Bhagat's claim satisfies the requisite amount for the attachment of diversity jurisdiction. Therefore, the claims asserted by Bhagat in the PAC are futile as to all defendants.

Conclusion

The motions to dismiss the complaint are granted. Plaintiffs motion to file an amended complaint is granted in part and denied in part, as set forth above.

**\*10** It is so ordered.

2004 WL 2809989 (S.D.N.Y.), RICO Bus.Disp.Guide 10,790

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



# EXHIBIT E

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1837366 (S.D.N.Y.))

Page  22

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

Stephen M. ROSS, Plaintiff,
v.
FSG PRIVATAIR INC. d/b/a Privatair
Defendant.

No. 03 Civ. 7292(NRB).

Aug. 17, 2004.

MEMORANDUM and ORDER

BUCHWALD, J.

*1 Plaintiff Stephen M. Ross ("plaintiff" or "Ross") initiated this action against defendant FSG PrivatAir Inc., d/b/a PrivatAir ("defendant" or "PrivatAir") claiming, through an Amended Complaint, breach of contract, breach of fiduciary duty and negligence, all related to Ross's prospective but ultimately unconsummated purchase of an aircraft from a third-party, Grafair. Defendant essentially acted as plaintiff's agent [FN1] in the failed transaction, and has now moved to dismiss plaintiff's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) on various grounds, including plaintiff's supposed failure to state a claim for any of his three causes of action. Additionally, defendant claims that in this suit plaintiff is advocating certain positions of law and fact that are inconsistent with those plaintiff advanced in prior related litigation, and as such plaintiff should be sanctioned pursuant to Fed.R.Civ.P. 11. For the reasons that follow, defendant's motion to dismiss is granted in part and denied in part, and its motion for Rule 11 sanctions is denied.

FN1. See infra note 2.

BACKGROUND

For purposes of this motion, the following facts, drawn from plaintiff's Amended Complaint unless otherwise noted, are taken as true, and all inferences are drawn in plaintiff's favor. See Burnett v. Carothers, 192 F.3d 52, 56 (2d Cir.1999).

A. The Failed Aircraft Purchase.

In or about 2001, plaintiff Ross, a New York resident, and defendant PrivatAir, a Delaware corporation with its principal place of business in the Connecticut, entered into an agreement whereby PrivatAir would act as Ross's agent  [FN2] in connection with Ross's prospective purchase of an aircraft in exchange for a commission if the purchase was consummated. At all times relevant to this agreement, PrivatAir held itself out as an expert in aircraft purchases and sales and the contract negotiations accompanying such transactions. According to Ross, he relied on this expertise in entering into his agreement with PrivatAir.

FN2. Ross alleges that PrivatAir was his agent. On a motion to dismiss, the Court need not credit legal conclusions included in a complaint's factual allegations. For purposes of this factual background, we refer to PrivatAir as Ross's "agent" only in a generic and not a legal sense. See Papasan v. Allain, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.")

On behalf of Ross, PrivatAir located and negotiated the purchase of a used 1981 Challenger 600 aircraft (the "Aircraft") owned by Grafair, a Florida corporation. An Aircraft Purchase Agreement (the "Grafair Agreement") drafted by PrivatAir codifying the transaction was entered into by Ross and Grafair on October 29, 2001. See Am. Compl., Ex. A. At some unspecified point, PrivatAir represented to Ross that the Grafair Agreement was PrivatAir's "standard purchase agreement." See Am. Compl., ¶ 13.

Ross placed into escrow a $100,000 deposit on the Aircraft. Upon satisfaction of all applicable terms and conditions in the Grafair Agreement, Ross was to purchase the Aircraft for $6,650,000. The Grafair Agreement reserved to Ross prior to closing the right to inspect the Aircraft at his own expense. It is Ross's contention that PrivatAir represented to him that pursuant to the terms of the Grafair Agreement Ross could terminate the Grafair Agreement after inspection for any or no reason. Ross further contends that if he chose to terminate, he would be refunded $85,000 of his deposit, and the $15,000 balance would be remitted to Grafair to cover the expense of relocating the Aircraft for inspection.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1837366, *2 (S.D.N.Y.))

*2 The inspection uncovered problems with the Aircraft itself and its regulatory paperwork. After the inspection, PrivatAir, allegedly without Ross's authorization or knowledge, urged Grafair to undertake certain repairs of the Aircraft. Ross, however, in light of the inspection results, elected to terminate the Grafair Agreement. Grafair, in response, claimed that the Ross had no right to repudiate because the Grafair Agreement did not provide Ross such a right and because of PrivatAir's post-inspection statements encouraging Grafair to repair the Aircraft. Grafair took the position that Ross would be in breach of contract if he did not complete the purchase.

B. The Florida Lawsuit.

The contract dispute between Ross and Grafair prompted an interpleader action by the deposit's escrowee against the two transacting parties in Oklahoma state court. That action was removed to the United States District Court for the Western District of Oklahoma, and then transferred to the Southern District of Florida. See Insured Aircraft Title Service, Inc. v. Stephen M. Ross and Grafair, Inc., 02-14081-Civ (S.D.Fla.) (the "Florida Lawsuit").

Ross and Grafair cross-claimed against each other in the Florida Lawsuit, the former alleging it had a right to terminate the Grafair Agreement, the latter alleging it was entitled to receive the entire $100,000 deposit, as well as consequential damages flowing from Ross's breach of the Grafair Agreement. Ross's motion for judgment on the pleadings on his cross-claim against Grafair was denied. See Florida Lawsuit, Order of Nov. 21, 2002. [FN3]

FN3. Ross's motion for judgment on the pleadings was not denied on the merits, but instead because Grafair had not yet filed an answer to Ross's cross-claims. See id., ¶ 5. In the Order, discovery was ordered completed by December 30, 2002, and a cutoff date of January 15, 2003 was set for dispositive motions. Id., at ¶ 8.

Following the denial of Ross's motion, Ross and Grafair entered into a settlement which, inter alia, provided for the escrowee's release to Grafair of the entire $100,000 deposit, and the discontinuance with prejudice of both Ross's and Grafair's cross-claims. See Affidavit in Support of Defendant's Motion to Dismiss of Russell J. Sweeting, Document 33 (Stipulation for Settlement). According to Ross's Amended Complaint, he entered into the settlement because the cost of discovery and trial would exceed his deposit, and to eliminate exposure to a potentially substantial verdict against him on Grafair's breach of contract cross-claims.

C. Ross's Claims.

On December 31, 2003, Ross filed an Amended Complaint in this action alleging that PrivatAir committed a breach of contract, breach of fiduciary duty, and negligence in the course of negotiating and executing the Grafair Agreement. Specifically, Ross claims that PrivatAir (1) drafted an Agreement with an ambiguity preventing Ross from recovering $85,000 of the deposit; [FN4] (2) misrepresented to Ross that the Grafair Agreement permitted Ross's recovery of $85,000 of the deposit; and (3) urged Grafair, without Ross's knowledge or authorization, to make certain repairs to the Aircraft. All three of these acts and omissions of PrivatAir's are alleged to constitute a breach of contract, a breach of fiduciary duty, and negligence. Ross claims that PrivatAir is liable to him for $169,612.65 plus interest, which is the sum of the $84,612.65 he paid in legal fees and disbursements in defending against the Florida Lawsuit, as well as the $85,000 partial deposit refund he believed he was entitled to upon terminating the Grafair Agreement. [FN5] On February 6, 2004, PrivatAir moved to dismiss the Amended Complaint. Oral argument on the motion was held on June 24, 2004.

FN4. Oddly, Ross's Amended Complaint never identifies the alleged ambiguity in the Grafair Agreement which in part gives rise to this lawsuit. However, the arguments of the parties in their briefing papers and clarification provided at oral argument indicates that the reference is to § 1.2(a) of the Grafair Agreement, which provides, in relevant part: Upon Buyer's acceptance of the Aircraft, as defined by Exhibit "B" attached, Buyer shall cause the [$100,000] deposit to be paid to Seller. The balance of the [$6,550,000.00] purchase price ... will be due and payable in immediately available U.S. funds upon delivery of the Aircraft pursuant to this Agreement. Exhibit "B" is a document headed "CONFIRMATION OF

Westlaw.

Not Reported in F.Supp.2d

**Page 24**

(Cite as: 2004 WL 1837366, *2 (S.D.N.Y.))

AIRCRAFT ACCEPTANCE". The document reads in relevant part: Pursuant to the Aircraft Purchase Agreement dated October 29, 2001 between Steven Ross ("Buyer") and Grafair ("Seller"), this is to confirm that Buyer has inspected the above referenced Aircraft on this date. Buyer hereby accepts the Aircraft and the deposit is nonrefundable in accordance with the terms of the Agreement subject to Seller correcting or requiring the following items[.] No items are identified, and the signature lines for Grafair and Ross are blank. Section 1.2(b) of the Agreement reads in full: If buyer does not accept the aircraft, Buyer will pay Seller, from the deposit, $15,000 to cover costs of moving aircraft to and from the pre-purchase facility. Also relevant to these provisions is the right of inspection given to Ross under the Agreement in § 2.2, which reads in relevant part: The sale is subject to Buyer's inspection and a one-hour test flight ... to determine [if] the Aircraft conforms with the conditions specified in Section 2.1 [related to the Aircraft's airworthiness] ... Buyer shall provide Seller with a written list of discrepancies within two (2) business days after completion of said inspection. All costs and expenses for repairs in order to make the Aircraft conform with conditions set forth in Section 2.1 shall be borne by Seller.

FN5. Although PrivatAir has not yet counter-claimed against Ross, Ross seeks also seeks a declaration that neither he nor anyone on his behalf owes PrivatAir $43,395.42 for services allegedly rendered.

DISCUSSION

I. Standard of Review for Motion to Dismiss

*3 In assessing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court is obligated to accept as true all well-pleaded factual allegations in the Amended Complaint, and view them in the light most favorable to plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236; Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir.1993). Defendant's motion is to be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Still v. DeBuono, 101 F.3d 888, 891 (2d Cir.1996) (citing Conley v. Gibson, 355 U.S. 41, 48 (1957)).

II. Breach of Contract Claim

According to plaintiff, he and PrivatAir entered into a contract under which plaintiff was to act as plaintiff's agent for plaintiff's purchase of an airplane, and plaintiff in turn would pay PrivatAir a commission upon purchase. See Am. Compl., ¶ 7-8. This contract was not reduced to writing.

Plaintiff alleges that defendant committed a breach of the contract by "(a) drafting the [Grafair] Agreement with an ambiguity that prevented Ross from recovering $85,000 of his deposit; (b) wrongly representing to Ross that the [Grafair] Agreement, as drafted, would permit him to recover $85,000 of his deposit; and (c) without Ross' knowledge or authorization, urging Grafair to proceed with certain repairs to the Aircraft." Am. Compl., ¶ 32. See also Am. Compl., ¶¶ 12, 15, 19.

A breach of contract claim under New York law [FN6] must establish (1) the existence of a contract; (2) plaintiff's performance on the contract; (3) defendant's breach of contract; and (4) resulting damages. See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir.1994). Additionally, where a breach of contract claim fails to denote the "essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated," it will be dismissed. See Highlands Ins. Co. v. PRG Brokerage, Inc., No. 01 Civ. 2272(GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) (quoting Sud v. Sud, 211 A.D.2d 423, 621 N.Y.S.2d 37, 38 (1st Dep't 1995); see also Window Headquarters, Inc. v. MAI Basic Four, Inc., Nos. 91 Civ. 1816(MBM), 92 Civ. 5283(MBM), 1993 WL 312899 at *3 (S.D.N.Y.1993) (stating that while a "plaintiff is not required to attach a copy of the contract or to plead its terms verbatim," a complaint in a breach of contract action must nevertheless "set forth the terms of the agreement upon which liability is predicated"). Defendant challenges the viability of plaintiff's breach of contract claim, contending that plaintiff has not alleged a breach of any term of the contract. While it is clear from the face of the Amended Complaint that plaintiff enumerates certain acts and omissions of PrivatAir's alleged to comprise breaches of the contract, PrivatAir maintains that this alleged conduct did not violate any contractual obligations actually existing between the parties. Based on Ross's recitation in the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Amended Complaint of the contract's formation and terms, we agree with PrivatAir. [FN7]

> FN6. There is agreement that New York law governs the consideration of this motion.

> FN7. PrivatAir also charges that Ross's damages claim is impermissibly speculative as the Florida Lawsuit's settlement forever placed in doubt whether Ross was entitled to recoup the deposit. Because we find that plaintiff's Amended Complaint fails to allege a breach of a contract provision, we need not address the damages issue.

**A. $85,000 of the Deposit.**

*4 According to Ross, he contract with PrivatAir to "act as Ross' agent in connection with the prospective purchase of an aircraft by Ross." Am. Compl., ¶¶ 7 and 8. PrivatAir, in turn, was to receive a commission from Ross if he ultimately purchased an aircraft. See id., ¶ 7. Ross asserts that because his Agreement with Grafair did not ultimately result in his recovery of $85,000 of his deposit, PrivatAir breached the contract it had with Ross. [FN8]

> FN8. The Grafair Agreement specified that "[a] refundable deposit of [$100,000] has been placed in escrow" and that "[u]pon Buyer's acceptance of the Aircraft ... Buyer shall cause the deposit to be paid to Seller. The balance of the purchase price [$6,550,000.00] will be due and payable ... upon delivery of the Aircraft pursuant to this Agreement." Agreement, §§ 1.2, 1.2(a). The Grafair Agreement further provided that if Ross did not accept the Aircraft, "Buyer will pay Seller, from the deposit, $15,000 to cover costs of moving aircraft to and from the pre-purchase facility." Id., at § 1.2(b).

Ross argues that PrivatAir, both before and throughout their engagement with Ross, held itself out as an "expert in aircraft sales and acquisitions, including without limitation, in negotiating contracts for the purchase and sale of aircraft." Am. Compl., ¶ 6. Moreover, Ross claims he relied on this self-professed expertise in choosing to contract for PrivatAir's services. Id. at ¶ 9.

These representations, however, are not alleged to have ever matured into specific, incorporated and binding terms of its contract with Ross. Thus, at most, the results of defendant's performance were inconsistent with general representations about its expertise and competence made incident to contract formation. Even if PrivatAir is to be held to an "as advertised" standard of performance, Ross's complaints are outside the scope of PrivatAir's representations. PrivatAir's self-praise related to contract negotiation (i.e. locating an airworthy aircraft and securing Ross a competitive price), not contract drafting. [FN9] Ross faults PrivatAir for misfeasance classifiable in the latter category.

> FN9. Ross evidently understands this distinction, as in his Memorandum of Law in Opposition to Summary Judgment ("Opp.Mem.") he states "[a]s Ross' broker, PrivatAir not only found Ross an airplane, but negotiated the transaction with the seller on Ross' behalf and drafted for him a contract embodying the deal it had negotiated." Opp. Mem. at 11 (emphasis added). While the two pursuits are not mutually exclusive, neither are they are coterminous, or synonymous. An expert in contract negotiating is by no means necessarily an expert in contract drafting, and a skilled contract drafter might not have any aptitude for contract negotiation and bargaining.

More importantly, Ross does not allege that, as part of PrivatAir's contractual obligations, PrivatAir was to furnish Ross a aircraft purchase agreement that permitted Ross to abort the agreement after an inspection at-will and then reclaim eighty-five percent of the deposit. PrivatAir's assurances regarding Ross's right under the Grafair Agreement to recover his deposit did not concern terms of its contract with Ross susceptible to breach. Significantly, it was not until after Ross and PrivatAir consummated their agreement that PrivatAir is alleged to reference particular rights possessed by Ross under its prospective contract with Grafair. Specifically, Ross avers that PrivatAir located the Aircraft and negotiated a purchase and sale transaction on Ross's behalf with Grafair. See Am. Compl., ¶¶ 10-11. Thereafter, PrivatAir drafted the Aircraft Purchase Agreement, which was to be executed by Ross and Grafair. See id., ¶ 12. PrivatAir informed Ross that the drafted Agreement was PrivatAir's "standard purchase agreement," one which allowed for Ross to terminate the Grafair Agreement after inspection of the Aircraft, for any or no reason, and then recover $85,000 of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1837366, *4 (S.D.N.Y.))

Page 26

$100,000 deposit. See id., ¶¶ 14-15.

Any facts giving rise to an obligation on the part of PrivatAir to arrange the Aircraft purchase in a way that offered Ross an opportunity to terminate the purchase and recover the bulk of his deposit postdate the formation of the Ross/PrivatAir contract. Nor does Ross allege that his contract with PrivatAir was subsequently modified to include this obligation. [FN10] Thus, PrivatAir was under no such obligation, and PrivatAir's alleged failure to draft an agreement in this regard cannot be a breach of the contract.

> FN10. In his opposition memorandum, Ross argues that "PrivatAir advised Ross that the contract was the standard agreement used for [aircraft] purchases, and that under it he could recover $85,000 of his deposit if he chose to terminate the deal. Ross reasonably relied upon such representations in signing the [Grafair] [A]greement." Opp. Mem. at 11. Ross's Amended Complaint does not seek recovery on a theory of promissory estoppel, although this appears to be the legal basis for this particular argument. Under New York law, a cause of action for promissory estoppel requires demonstration of the following: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance. See Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir.2000). Ross would face the difficult task of establishing that the prospective purchaser of a $6 million aircraft reasonably relied on what amounts to legal advise from a non-lawyer.

B. Repairs to the Aircraft.

*5 Ross also alleges that PrivatAir unauthorizedly petitioned Grafair to repair the Aircraft after Ross's inspection gave Ross reason to seek to terminate the Grafair Agreement. See Am. Compl ., ¶¶ 18-20. Because Grafair was urged to proceed with repairs, Grafair maintained that Ross could not then back out of the sale. Id., ¶ 21. Ross argues that PrivatAir's unauthorized statements to Grafair, which had the purported effect of binding Ross to purchase the Aircraft, were a breach of contract.

Ross's allegations in this regard fail to articulate an actionable breach of contract. As with Ross's claim of a breach with respect to the deposit, this allegation does not identify what term of his contract with PrivatAir was breached by these statements or their consequences. Instead, it simply assumes the described conduct was proscribed by or inconsistent with the contract. If Ross limited PrivatAir's authority to act on his behalf, the Amended Complaint should at the very least demarcate the bounds on that authority. Otherwise, there is no way for the Court to discern whether this particular act, if true, violated a provision of the contract agreed upon by the two parties. [FN11] See Highlands Ins., 2004 WL 35439, at *8; Sud, 211 A.D. at 424, 621 N.Y.S.2d at 38; see also Window Headquarters, 1993 WL 312899, at *3.

> FN11. Ross cites to William Wrigley Jr. Co. v. Waters, 890 F.2d 594 (2d Cir.1989) for the proposition that "[i]t is well settled under New York law that negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract, which may be submitted to the trier of the case alternatively", and that by acting without authority with regard to the aircraft repairs, PrivatAir did not act with reasonable skill and care. For this reason, Ross claims he need not allege the specific supposedly broken terms of his agreement with PrivatAir because PrivatAir's failure to deliver its services with appropriate competence was itself a breach. We disagree with Ross's interpretation of Wrigley. The case merely stands for the proposition that negligent performance of contract can sometimes constitute a tort as well as a breach of contract. We do not think this means that every negligent performance of a contract is itself a breach of the contract. Instead, a negligent performance of a contract might cause a breach of contract. Under that circumstance, a plaintiff is not relieved of its obligation to identify what term of a contract was actually breached. Moreover, plaintiff's assertion that he need not specify the terms of the agreement on which he maintains defendant's liability is directly refuted by well-settled New York law. See Highlands Ins., 2004 WL 35439, at *8; Sud, 211 A.D. at 424, 621 N.Y.S.2d at 38; see also Window Headquarters, 1993 WL 312899, at *3. To the extent Ross means to advance a breach of the term of good faith and fair dealing implied in every contract, it is subsumed by the discussion of plaintiff's breach of a fiduciary duty claim.

III. Breach of Fiduciary Duty Claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1837366, *5 (S.D.N.Y.))

Ross asserts that "[a]s Ross's agent, PrivatAir had a fiduciary duty to Ross." Am. Compl., ¶ 35. Ross's Amended Complaint does not define what that duty was or entailed. [FN12] As discussed above, Ross elsewhere alleges that PrivatAir "held itself out to be expert in aircraft sales and acquisitions, including without limitation, in negotiating contracts for the purchase and sale of aircraft," id., ¶ 6, and that Ross relied on these representations in entering into its contract. Id., ¶ 9. According to Ross, the same exact acts and omissions of PrivatAir's that violated the contract also constituted a breach of fiduciary duty, namely, again, "(a) drafting the [Grafair] Agreement with an ambiguity that prevented Ross from recovering $85,000 of his deposit; (b) wrongly representing to Ross that the [Grafair] Agreement, as drafted, would permit him to recover $85,000 of his deposit; and (c) without Ross' knowledge or authorization, urging Grafair to proceed with certain repairs to the Aircraft." Id., ¶ 37.

> FN12. In his opposition memorandum, Ross asserts that "a broker owes fiduciary duties to his principal." Opp. Mem. at 10 (citations omitted). Nowhere in his Amended Complaint does Ross allege that PrivatAir was his broker. If being an agent is not synonymous with being a broker, then Ross's arguments about the responsibilities of a broker are an impermissible attempt to amend his complaint through a briefing memorandum. See Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 518, 526 (S.D.N.Y.1977) (stating that party may not amend pleading through statements in briefs).

Under New York law, an actionable breach of fiduciary duty claim is comprised of the existence of a fiduciary relationship and damages caused by a breach of the fiduciary duty. See, e.g., Cramer v. Devon Group, 774 F.Supp. 176, 184 (S.D.N.Y.1991).

A. Was There A Fiduciary Relationship?

A fiduciary duty exists "when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another", and "[w]hether one party is a fiduciary of another depends on the relationship between the parties."

Reuben H. Donnelley Corp. v. Mark I Marketing Corp., 893 F.Supp. 285, 289 (S.D.N.Y.1995). Attorney/client or doctor/patient relationships "are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties." Id. However, "a conventional business relationship does not create a fiduciary relationship in the absence of additional factors." Id., quoting Feigen v. Advance Capital Management Corp., 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989). Indeed, "[u]nder New York law, parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree," or if "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." Calvin Klein Trademark Trust v. Wachner, 123 F.Supp.2d 731, 733-34 (S.D.N.Y.2000).

*6 It is insufficient to merely allege the existence of a fiduciary relationship. Instead, "to plead a cause of action alleging that defendants became fiduciaries, plaintiffs must allege at least some factors from which a court could conclude that such a relationship has been established." Boley v. Pineloch Associates, Inc., 700 F.Supp. 673, 681 (S.D.N.Y.1988). Moreover, it is well-settled that "a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656-57 (1987) (citations omitted). A tort claim is barred as redundant where it is "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract." Id. at 657.

Fiduciary obligations are not imposed on one party merely because it possesses relative expertise as compared to the other. See Mechigian v. Art Capital Corp., 612 F.Supp. 1421, 1430 (S.D.N.Y.1985) (finding that "[p]laintiff has provided no support for the proposition that mere expertise in a matter create fiduciary responsibilities, which is essentially the sum and substance of his argument"); see also Boley, 700 F.Supp. 673, 681 (holding that "[a]llegations of

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1837366, *6 (S.D.N.Y.))

reliance on another party with superior expertise, standing by themselves, will not suffice").

Furthermore, where the parties' contract forms both the foundation and boundary of their relationship, fiduciary responsibilities have not attached. See Reuben H. Donnelley Corp., 893 F.Supp. at 290 (refusing to find a fiduciary obligation where "absent ... contractual obligations" the complained of "conduct would not be actionable"); see also Clark-Fitzpatrick, Inc., 521 N.Y.S.2d at 656-57, 70 N.Y.2d at 389 (barring a tort claim that was redundant of a contract claim).

With the foregoing authority in mind, for purposes of this motion we conclude that plaintiff has adequately pled that PrivatAir had a fiduciary relationship with Ross based on his allegation and description of an agency relationship with PrivatAir coupled with his claim that he both relied on PrivatAir's espoused expertise and over the course of their relationship had PrivatAir negotiate with Grafair on his behalf. See Frydman & Co. v. Credit Suisse First Boston Corp., 272 A.D.2d 236, 237, 708 N.Y.S.2d 77, 79 (1st Dep't 2000) (holding that a fiduciary duty existed where bank provided plaintiff "with investment banking advice and other services, including conducting negotiations with ... on [plaintiff's] behalf ... in connection with the attempted acquisition" of a business); see also Wiener v. Lazard Freres & Co., 672 N.Y.S2d 8, 15 (1st Dep't 1998) (holding that a fiduciary obligation has been adequately pled where inter alia the defendant assumed negotiations on behalf of plaintiff, where plaintiff relied on defendant's expertise).

B. Was The Fiduciary Duty Breached?

*7 To find a fiduciary relationship through agency only begins the inquiry, which also requires identifying, amongst other things, the particular obligations owed. See SEC v. Chenery Corp., 318 U .S. 80, 85-86 (1943). Under New York law an agent owes its principal fiduciary duties of good faith and loyalty. See Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp., No. 97 Civ. 5499(LAP), 2004 WL 691680 at *19, (S.D.N.Y. Mar 31, 2004) (stating that all agents owe their principals "general fiduciary duties of good faith and loyalty"); cf. Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d

Cir.2003) ("Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties") (citations and quotations omitted). Additionally, there is authority for the general proposition that a fiduciary is "responsible to undertake reasonable diligence" upon matters within the fiduciary obligation. BNY Capital Markets, Inc. v. Moltech Corp., 99 Civ. 11754(GEL), 2001 WL 262675 at *8 (S.D.N.Y. Mar. 114, 2001). A fiduciary obligation, however, is "limited to matters relevant to affairs entrusted." Rush v. Oppenheimer & Co., Inc., 681 F.Supp. 1045, 1055 (S.D.N.Y.1988); BNY Capital Markets, 2001 WL 262675 at * 8 (stressing that a "fiduciary is only responsible to undertake reasonable diligence or give advice for the benefit of another upon matters within the scope of the relation" ) (emphasis in original, citations and quotations omitted).

PrivatAir's alleged breaches with respect to the contract language are on their face outside the confines of its fiduciary obligations. PrivatAir is affirmatively alleged to only possess expertise in "aircraft sales and acquisitions" and in "negotiating contracts for the purchase and sale of aircraft." Am. Compl. ¶ 6. PrivatAir is not a law firm. Plaintiff cites no authority which supports holding a non-lawyer to a special standard of care for conduct that is the province of attorneys, such as contract drafting and interpretation. Regardless of how plaintiff may have interpreted PrivatAir's abilities or representations, PrivatAir cannot be held liable for what is essentially a legal malpractice claim when it never held itself out to be an attorney. See BNY Capital Markets, 2001 WL 262675, at *8.

Ross also claims that PrivatAir breached its fiduciary duty by urging Grafair to make repairs to the Aircraft. Unlike contract drafting and interpretation, PrivatAir's charge to communicate with prospective airplane sellers was attended by fiduciary duties. Thus, it would be inappropriate to dismiss this particular claim of Ross's at this time. [FN13]

FN13. It is, however, appropriate to note that the authority which enables a portion of Ross's breach of fiduciary duty claim to survive contain affirmative allegations of active disloyalty and self-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1837366, *7 (S.D.N.Y.))

dealing. See Frydman, 708 N.Y.S.2d at 79; Wiener, 672 N.Y.S2d at 15. The absence of such claims here could make those cases distinguishable from the present one. Moreover, based on what has been presented to the Court thus far (in Ross's amended complaint, his opposition memorandum, and during oral argument), we are highly skeptical that Ross will be able to establish a breach of fiduciary duty sufficient to withstand summary judgment. For example, Ross will have to demonstrate that PrivatAir's statements to Grafair were actually unauthorized, a position which has yet been set out in any detail. But there is serious tension between Ross's claim that PrivatAir was his fiduciary, which depends in large part on PrivatAir possessing authority to negotiate on Ross's behalf, and the claim that PrivatAir had to seek permission from Ross before acting. It seems the more control Ross had over PrivatAir, the less PrivatAir can be considered a trusted and empowered fiduciary acting on Ross's behalf by virtue of its expertise as opposed to Ross's direction. Ross will also have to establish that PrivatAir's supposedly unauthorized actions actually caused the damage he claims. Again, based on the Court's current understanding of the allegations, this will be a challenge. This Court is not bound to Grafair's interpretation of PrivatAir's communications or the Grafair Agreement, which included specific provisions defining the mechanics of acceptance, as well as an integration clause.

IV. Negligence Claim

PrivatAir is alleged to have committed negligence for the same exact reasons PrivatAir is alleged to have breached its contract with and fiduciary duties owed to Ross. See Am. Compl., ¶ 42. The elements of a negligence claim under New York law are "(1) a duty owed by the defendant to the plaintiff; (2) a breach thereof; and (3) injury proximately resulting therefrom." Solomon v. City of New York, 489 N.E.2d 1294, 1294-95 (1985); see also Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 79 (2d Cir.1997). In particular, Ross is accused of violating a duty to act with reasonable care and skill. See Am. Compl., ¶ 43; see also Opp. Mem., at 18. This allegation, framed as one for negligence, is subsumed by Ross's contract and fiduciary duty claims. Again, "a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated. This legal duty

must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 521 N.Y.S.2d 653, 656-57, 70 N.Y.2d 382, 389 (1987) (citations omitted). The only possible sources of a duty of PrivatAir's to exercise reasonable care and skill in performing its contract with Ross are the contract itself, or from PrivatAir's fiduciary status. As such, plaintiff's negligence claim fails. See, e.g., Seybert-Nicholas Printing Corp. v. MLP U.S.A., Inc., No. 92 Civ. 6143(RPP), 1992 WL 315643, at * 1 (S.D.N.Y. Oct. 22, 1992).

V. Rule 11 Sanctions

*8 Defendant's motion for Rule 11 sanctions is plainly deficient as a matter of procedure, and is therefore denied.

Rule 11 sanctions are appropriate only after the allegedly offending party has been afforded a remedial "safe harbor" period. Under Rule 11(c)(1)(A):

A motion for sanctions ... shall be made separately from other motions or requests ... [and] shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

Here, Ross was not served with PrivatAir's Rule 11 motion twenty-one days prior to its filing. Instead, the Rule 11 motion, which was made as part of PrivatAir's motion to dismiss, was contemporaneously served on Ross and filed with this Court. Nor is the Court informed of any other pre-filing notice provided by PrivatAir to Ross substantially fulfilling the safe harbor requirement. In brief, Ross has been deprived of any opportunity to "withdraw [ ] or appropriately correct[ ]" the challenged matter, and therefore we will not consider the merits of PrivatAir's Rule 11 application. The motion is denied.

CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted with respect to the breach of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1837366, *8 (S.D.N.Y.))

contract and negligence counts. With respect to the breach of fiduciary duty count, defendant's motion is granted except that it is denied with respect to Ross's allegation that PrivatAir urged Grafair to repair the Aircraft without Ross's knowledge or authorization. Defendant's motion for Rule 11 sanctions is denied.

By September 8, 2004, the parties are to confer about and submit for the Court's review a discovery and motion schedule that is prompt and targeted at the issues raised in footnote 13 of this Memorandum. Upon completion of this limited discovery the Court will entertain a motion for summary judgment from defendant.

IT IS SO ORDERED.

2004 WL 1837366 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

# EXHIBIT F

Not Reported in F.Supp.2d
RICO Bus.Disp.Guide 10,604
(Cite as: 2004 WL 35439 (S.D.N.Y.))

United States District Court,
S.D. New York.

HIGHLANDS INSURANCE CO., Plaintiff and
Counterclaim Defendant,
v.
PRG BROKERAGE, INC., Prompt Claims
Service, Inc. and Lawrence W. Blessinger,
Defendants, Counterclaim Plaintiffs and Third
Party Plaintiffs,
v.
HIGHLANDS INSURANCE COMPANY,
Counterclaim Defendant,
and
Willis T. KING, Third Party Defendant

No. 01 Civ. 2272(GBD).

Jan. 6, 2004.

**Background:** Insurer that provided commercial automobile insurance sued insurance broker, its chief executive officer (CEO), and claims handler, alleging violations of Racketeer Influenced and Corrupt Organizations Act (RICO), fraud, and pendent state law claims in connection with insurer's agreement to provide automobile insurance to livery drivers. Defendants joined insurer's CEO as a third party defendant and asserted counterclaims against insurer and its CEO. Parties filed cross-motions to dismiss.

**Holdings:** The District Court, Daniels, J., held that: (1) insurer's complaint failed to allege fraud with sufficient particularity; (2) dismissal of insurer's fraud claims warranted dismissal of its RICO claims; (3) insurance broker was not liable to insurer for negligence or breach of fiduciary duty; (4) broker was not liable for breach of contract; (5) claims handler was not liable to insurer for alleged breach of claims handling duty; (6) defendants' RICO claims against insurer were insufficient to support claim of racketeering activity based upon fraud; and (7) broker and claims handler lacked standing to seek declaratory judgment as to insurer's notices of policy nonrenewal or revocation of broker's authority to issue certificates of insurance.

Motions granted.

West Headnotes

**[1] Federal Civil Procedure    636**
170Ak636
Complaint of commercial automobile insurer failed to allege fraud with sufficient particularity against insurance broker and claims handler, as required to state fraudulent inducement claim based on insurer's execution of insurance policies on city livery drivers that allegedly resulted from material misrepresentations of fact; insurer did not specify which particular loss ratios broker had falsely understated or which claims were delayed by broker, there was no factual support for claim that defendants misrepresented that insurer's proposed premium rates were too high, and no support for claim that nature and scope of policies, or their profitability, were misrepresented.   Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] Insurance    1648**
217k1648
Alleged felony conviction and lack of broker license of insurance broker were insufficient to provide cognizable basis for commercial automobile insurer to state claim of fraud, as it related to insurance policies issued to city livery drivers through risk purchasing group; insurer did not allege that broker's alleged conviction related to insurance fraud or anything similarly relevant, alleged conviction was 15 years old at time insurance contracts were signed, and insurer did not allege that broker's omissions or misstatements regarding conviction or license induced it to enter contracts or otherwise led to its injury.   Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3]   Racketeer   Influenced   and   Corrupt Organizations    70**
319Hk70
Dismissal of commercial automobile insurer's fraud claims against insurance broker, its chief executive officer (CEO), and claims handler, for failing to plead allegations with sufficient particularity, warranted dismissal of insurer's claims under Racketeer Influenced and Corrupt Organizations Act (RICO) in which insurer alleged that defendants engaged in racketeering activity of committing fraud in livery driver insurance market.   Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1962(c, d).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

**[4] Insurance    1644**
217k1644

**[4] Insurance    1647**
217k1647
Insurance broker was not liable to insurer for negligence or breach of fiduciary duty associated with insurer's issuance of binders of commercial automobile insurance to risk purchasing group for city livery drivers; broker did not owe fiduciary duty to insurer under agency principles, exception to general rule governing absence of agency relationship relating to broker's receipt and collection of funds did not apply, and insurer's generalized allegations that broker did not exercise reasonable care were insufficient to extend applicable standard of care otherwise existing in broker-insurer relationship. McKinney's Insurance Law §§ 2102(c), 2120.

**[5] Insurance    1638**
217k1638
Insurance broker's actions did not constitute unauthorized agency as to insurer that had allegedly revoked broker's authority to act on its behalf with respect to commercial automobile policies issued to city livery drivers; broker's agency relationship with insurer related only to procurement of requested policies and handling of funds received from risk purchasing group, broker's issuance of certificates of insurance was done as agent of risk purchasing group to whom it owed duty of care, and there was no evidence that certificates of insurance that broker issued were for new policies beyond those that insurer had agreed to insure.

**[6] Insurance    1644**
217k1644
Insurance broker that was responsible for underwriting group insurance policies between commercial automobile insurer and risk purchasing group insuring city livery drivers was not liable to insurer for breach of contract; there was no evidence that broker was signatory or in any other way a party to group insurance policies issued, and insurer's letter informing broker that it would insure no additional insureds under last two policies, and that broker agreed it would issue no new certificates of insurance under same policies, lacked consideration and did not result in contract.

**[7] Insurance    1649**

217k1649
Commercial automobile insurer's claim of conversion against insurance broker and its chief executive officer (CEO), alleging that it had ownership right in data tape that broker refused to return containing information about drivers covered by group insurance policies, was not cognizable; data contained on tape was intangible property, and tape was never insurer's property because broker compiled information on its behalf and put information on tape that broker already owned.

**[8] Antitrust and Trade Regulation    151**
29Tk151
(Formerly 92Hk33, 92Hk1  Consumer Protection)
Commercial automobile insurer's claim that insurance broker and claims handler conspired to fraudulently induce it into insuring members who were city livery drivers failed to allege a consumer injury or harm to public interest, as required to state claim of deceptive trade practices under state law; complaint alleged only a private injury and sought damages relating only to monetary losses that insurer allegedly suffered from private injury. McKinney's Business Law § 349(a).

**[9] Insurance    3242**
217k3242
Claims handler was not liable to commercial automobile insurer for breach of claims handling duty that allegedly arose under contractual or fiduciary relationship with insurer, as to insurer's allegation that claims handler submitted and processed claims so that broker could falsely understate loss ratios under insurer's group insurance policies; complaint did not allege sufficient facts to support inference that fiduciary duty existed between insurer and claims handler who merely had arms' length relationship, and claims handler's alleged breach of contract did not by itself create a fiduciary duty.

**[10] Federal Courts    88**
170Bk88

**[10] Federal Courts    89**
170Bk89
Venue was proper in Southern District of New York as to counterclaims that insurance broker and claims handler asserted against chief executive officer (CEO) of commercial automobile insurer who brought action in same district alleging claims based

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439 (S.D.N.Y.))

in contract and tort; even though insurer's CEO lived and worked in New Jersey, insurer sufficiently established that substantial part of events giving rise to claims occurred in Southern District of New York, and counterclaims were compulsory because they arose out of same transaction or occurrence. 28 U.S.C.A. § 1391(a); Fed.Rules Civ.Proc.Rule 13(a), 28 U.S.C.A.

**[11] Insurance     1648**
217k1648
Claim that automobile insurer and its chief executive officer (CEO) had devised scheme to defraud insurance broker and claims handler by inducing broker to market insurer's group insurance in order to gain dominant market share in livery insurance market, had cancelled group policies intending to later charge broker's customers higher premium rates, and had revealed intention to file RICO action against broker to brokers' competitors was insufficient to support racketeering activity based upon fraud under Racketeer Influenced and Corrupt Organizations Act (RICO); there was no evidence that insurer did not intend to follow through with its obligations under agreement at time it executed the policies or that it filed civil suit intending to destroy and recapture broker's business for its own benefit. Racketeer Influenced and Corrupt Organizations Act is cited as 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[12] Declaratory Judgment     301**
118Ak301
Insurance broker and claims handler, who were not parties to group automobile insurance policies issued by insurer to city livery drivers, lacked standing to seek declaratory judgment that insurer's notices of nonrenewal were invalid and that insurer's revocation of broker's authority to issue certificates of insurance was in breach of the policies, which were otherwise non-cancellable except under certain conditions; neither broker nor claims handler were third-party beneficiaries under policies' express provisions, and other documents read together did not reveal intent to confer third party beneficiary status upon them.

**[13] Antitrust and Trade Regulation     151**
29Tk151
(Formerly 92Hk33  Consumer Protection)

**[13] Antitrust and Trade Regulation     251**

29Tk251
(Formerly 92Hk1  Consumer Protection)
Counterclaim brought by insurance broker and claims handler against commercial automobile insurer, alleging that insurer made misrepresentations of material fact to induce broker to assist it in achieving dominant position in city's livery insurance market, failed to allege a consumer injury or harm to public interest, as required to state claim of deceptive trade practices under state law. McKinney's Business Law § 349(a).

MEMORANDUM OPINION AND ORDER

DANIELS, J.

**\*1** Plaintiff, an insurance company, brought this twelve count action against defendants alleging violations of RICO, fraud, and pendent state law claims in connection with plaintiff's agreement to provide commercial automobile insurance to certain livery drivers in New York City. [FN1] Defendants joined Willis T. King as a third party defendant, and counterclaimed against both plaintiff and King, alleging RICO violations, as well as breach of contract, and other pendent state law claims. The parties then filed cross-motions to dismiss. [FN2] For the following reasons, defendants' motion to dismiss the complaint is granted and the complaint is hereby dismissed in its entirety. Highlands' motion to transfer venue as to the claims against King is denied. Highlands' partial motion to dismiss the counterclaims is granted. [FN3]

FN1. Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1332, because the action not only arises under the laws of the United States but also involves diversity of citizenship.

FN2. Defendants PRG Brokerage, Inc and Lawrence Blessinger moved to dismiss Counts I-IV, and VI-XII of the complaint ("PRG's motion"). Defendant Prompt Claims Services moved to dismiss Counts I-IV, and XI-XII of the complaint ("PCS's motion") (collectively, "defendants' motion"). Plaintiff Highlands Insurance Co. and third party defendant Willis T. King filed a motion to dismiss counterclaims I-V, and VIII. ("Highlands' motion").

FN3. Highlands has not moved to dismiss the state law counterclaims VI (Breach of Contract relating



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *1 (S.D.N.Y.))

Page 35

to the policies), VII (Violation of New York State Insurance Law § 3426(k)), IX (Defamation) and X (Breach of Contract relating to the supplemental services agreement).

## Background

Plaintiff Highlands Insurance Co. ("Highlands") is in the business of providing commercial property and casualty insurance to regional small business markets. Third party defendant Willis T. King is the CEO of Highlands. Defendant PRG Brokerage Inc. ("PRG") is an insurance broker in New York, and defendant Lawrence Blessinger is the CEO of PRG. Aramarine Brokerage, Inc. ("Aramarine") is also an insurance broker in New York. Silver Car Purchasing Group, Inc. ("Silver Car") is a risk purchasing group for livery car drivers in New York City. Silver Car is organized by Aramarine. Defendant Prompt Claims Services ("PCS") is a claims handler that, inter alia, conducts investigations relating to auto accident claims.

In or about 1999, Highlands agreed to provide insurance to livery car drivers in New York City through Silver Car. Around January 26, 2000, Highlands executed 13 different binders of insurance for 13 group policies to Silver Car. PRG and Aramarine, as brokers, underwrote the policies, and received certain commissions for their work. The policies were effective as of March 1, 2000. The terms of the policies provided, inter alia, that: 1) the policy period was three years, from March 1, 2000 through March 1, 2003; and 2) the policies were "non-cancellable" by Highlands, except for either non-payment of premiums or other specific reasons set out in the New York Insurance Law.

Around December 19, 2000, Highlands sent PRG and each of Silver Car's insured members, copies of a "Notice of Nonrenewal," stating that Highlands was not going to renew the policies, effective March 1, 2001, two years short of the termination date. Further, around December 21, 2000, Highlands sent PRG and Aramarine a letter purporting to revoke their authority to bind coverage or issue certificates of insurance to Silver Car members on behalf of Highlands. Highlands then filed the instant action against Silver Car, Aramarine, PCS, PRG, and Blessinger on March 16, 2001 alleging RICO violations, as well as fraud, breach of contract, and other pendent state law claims. One month later,

Highlands settled with Silver Car and Aramarine, who were then dismissed from the suit. PRG, Blessinger, and PCS, however, remained as defendants. The remaining defendants then joined King as a third party defendant, and filed counterclaims against Highlands and King asserting their own RICO claims, as well as breach of contract, and other pendent state law claims. [FN4]

> FN4. On February 15, 2001, one month before Highlands filed the instant action, Silver Car and Aramarine filed a complaint against Highlands in New York Supreme Court, seeking a Temporary Restraining Order ("TRO") preventing Highlands from, inter alia, terminating the Silver Car policies. On February 22, 2001, Highlands joined PRG as a third party defendant. The next day, the Supreme Court granted Silver Car and Aramarine's application for a TRO. Highlands then removed the case to federal court. However, this Court granted PRG's motion to remand on the grounds that Highlands had voluntarily submitted to the jurisdiction of the state court by joining PRG. Thereafter, on March 16, 2001, Highlands commenced the instant separate action against defendants in this Court. The TRO issued by the state court was eventually dissolved and that action was dismissed with prejudice as to the claims between Silver Car, Aramarine, and Highlands, and without prejudice as to the claims by and against PRG.

## Discussion

*2 Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint where the complaint "fail[s] ... to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir.2002). However, bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss. See Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). Here, a motion to dismiss will only be granted if the claimant can prove no set of facts in support of its claim that would entitle it to relief. See Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir.1992).

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *2 (S.D.N.Y.))

Page 36

A. Defendants' Motion to Dismiss the Complaint
1. Fraud and Conspiracy to Commit Fraud

Highlands alleges that it was fraudulently induced by defendants to insure the Silver Car policies. Defendants argue that Highlands' fraud claims fail as a matter of law because they are not pled with particularity. Specifically, defendants argue that plaintiff has only set forth conclusory allegations in the complaint, which fail to identify the time, place, speaker, and content of the alleged misrepresentations.

[1] A fraud claim consists of five elements: 1) a representation of material fact; 2) that was false; 3) scienter; 4) reliance by the plaintiff; and 5) injury. See Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 578 N.Y.S.2d 128, 585 N.E.2d 377, 378-79 (N.Y.1991); Giffune v. Kavanagh, 302 A.D.2d 878, 753 N.Y.S.2d 784, 784 (N.Y.App.Div.2003). There are heightened pleading standards where fraud is concerned, as Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." See id.

Fraud allegations in a complaint therefore must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994). Although the scienter requirement need not be pled with particularity, "[i]n order to avoid abuse ... plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." Campaniello Imports, Ltd. v. Saporiti Italia S.P.A., 117 F.3d 655, 663 (2d Cir.1997). Mere "puffery" or opinions as to future events are not sufficient to form the basis of a fraud claim. See Baker v. Dorfman, 239 F.3d 415, 423 (2d Cir.2000); Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.1994).

In this case, Highlands alleges in its complaint that defendants fraudulently induced Highlands to execute the Silver Car policies by making material misrepresentations and/or omissions of fact. However, Highlands' allegations consist only of broad and general accusations that do not satisfy Rule 9(b)'s pleading requirements. For example, Highlands contends that PCS was controlled by PRG, and that PRG therefore was able to delay PCS's submission and processing of claims so that PRG could falsely understate loss ratios. See Complaint at ¶ 14d. Highlands also argues that defendants never intended to pay all the claims submitted to it by insurers or provide promised ancillary services, such as claims investigation and risk management. See id. at ¶¶ 14e, 25d. Highlands, however, presents no specific information in the complaint regarding which particular loss ratio figures were falsely understated, which specific claims were delayed, or for that matter, the source of Highlands' information that PRG was delaying the processing of claims so as to falsely understate loss ratios. Further, Highlands provides no specific factual support for its bald statement that defendants never intended to pay all the claims or provide promised ancillary services.

*3 Highlands also contends that defendants made fraudulent misrepresentations with respect to the amount of premium rates that the New York Insurance Department would approve for the policies. Highlands contends that PRG represented that Highlands' proposed rates were too high for approval by the Insurance Department. Highlands argues that, in reliance on this representation, it consented to charging a lower rate for the policies. Highlands contends that PRG induced it to accept filing the lower rates so that PRG could charge certain ancillary fees to the insureds for PRG's own collection and still keep the total price of insurance competitive. See id. at ¶¶ 14h, 37-46. Other than bald contentions, however, Highlands presents no factual assertions to support its allegations that the Insurance Department would have approved the higher proposed rates, and that PRG knew this at the time it made the representation.

Further, Highlands alleges in the complaint that defendants misrepresented the nature, size, and scope of the Silver Car policies. Highlands contends that the drivers and cars in the insurance policies were substantially more risky than PRG represented they would be. In particular, Highlands contends that defendants misrepresented the nature of the last two policies that Highlands agreed to insure, in that those policies included a number of older cars and "gypsy cabs," presenting a greater insurance risk than newer cars or radio cars. See id. at ¶¶ 25f, 27-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *3 (S.D.N.Y.))

Page 37

32, 57-58. As with the allegations above, these too are not pled with particularity as they are nothing more than bald contentions, with no factual support. Highlands has not identified a particular document or speaker as the source of these alleged misrepresentations.

Highlands also contends that defendants misrepresented the profitability of the Silver Car insurance program. Highlands argues that defendants represented that the insurance program had been profitable in the past, and would be profitable for Highlands. Highlands also alleges that defendants provided Highlands with loss information from a prior insurance program that they knew was false, and that defendants concealed adverse loss ratios that other insurance companies had experienced through Silver Car. See id . at ¶¶ 25a, 26a-c. To the extent the allegations address defendants' promises about the future profitability of the Silver Car policies, the allegations are not actionable, as they are nothing more than puffery. With respect to the allegations that defendants provided Highlands with inaccurate loss information, plaintiff again has failed to plead with particularity. The complaint is devoid of any specificity regarding the figures that were provided to plaintiff, how those figures differ from the actual correct figures, or at least, the means by which plaintiff discovered that the numbers provided were inaccurate.

Highlands also contends that defendants represented that they knew of no pervasive problems with fraud in the livery car insurance business, but in fact knew that the business was rife with fraud. See id. at ¶ 26c. The complaint further alleges that defendants represented that they had extensive expertise in preventing fraudulent claims, but in fact lacked expertise and knew they could not prevent pervasive fraud under the policies. See id. at ¶¶ 25b-c. Highlands' mere generalized allegations that defendants "knew" that there was fraud in the industry, however, are not sufficient to allege an inference of scienter. Further, to the extent that defendants made statements that they had expertise in the field of livery car insurance, this again is nothing more than puffery, and is not actionable.

*4 [2] Lastly, Highlands contends that Lawrence Blessinger, the CEO of PRG, concealed the fact that he was convicted of a felony on August 7, 1984 and

that he intended to use a sham brokerage known as the Kaitlyn Agency as a means of obtaining additional compensation. Highlands contends that Blessinger held himself out as a licensed insurance broker, but due to his felony conviction, he was not able to obtain a license. See Complaint at ¶¶ 26d-e. Highlands' statements regarding the Kaitlyn Agency are wholly irrelevant as Highlands does not contend that the Kaitlyn Agency or Blessinger's relationship with the Kaitlyn Agency contributed in any manner to Highlands' decision to insure the Silver Car policies. Further, Highlands' contention that Blessinger is a convicted felon who falsely held himself out as a licensed insurance broker, by itself, is not enough to state a claim for fraud. Highlands has not contended that the alleged felony conviction relates to insurance fraud, or anything similarly relevant. At the time Highlands signed the contracts, Blessinger's alleged felony conviction was 15 years old. Even assuming the truth of the allegations regarding the felony conviction and broker license, Highlands does not contend that this alleged omission induced them to enter into the contracts or otherwise led to Highlands' injury. The injury Highlands complains of is, essentially, that it lost money on the Silver Car policies. However, Blessinger's alleged felony conviction and lack of a broker license are not misstatements or omissions with respect to the nature of the Silver Car policies, or Highlands' potential risk exposure under the policies. Even assuming the truth of these allegations, they are not material to the injury about which Highlands complains.

Therefore, Highlands has failed to state a claim for fraud as it has not pled fraud with particularity. Consequently, defendants' motion to dismiss Counts III (Fraud) and IV (Conspiracy to Commit Fraud) is granted.

### 2. RICO and RICO Conspiracy

[3] Highlands alleges that the defendants constitute an enterprise engaged in a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). The racketeering activity that Highlands alleges is fraud in the livery driver insurance market, including fraud on Highlands by inducing Highlands to offer automobile insurance to Silver Car. Since this Court has dismissed Highlands' fraud claims, the RICO

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *4 (S.D.N.Y.))

claims, too, necessarily fail as a matter of law. Consequently, defendants' motion to dismiss Counts I (RICO) and II (RICO Conspiracy) of the complaint is granted.

### 3. Negligence and Breach of Fiduciary Duty

Highlands contends that PRG was Highlands' agent, by virtue of the fact that it was Highlands' broker. Highlands contends that under common law agency principles, PRG owed Highlands both a duty of care and fiduciary duty which PRG breached. PRG contends, however, that it had only a limited agency relationship with Highlands, and that Highlands is attempting to hold PRG accountable for a duty of care beyond the limited one established by their broker-insurer relationship.

*5 To state a claim for negligence, a plaintiff must allege: 1) the existence of a duty; 2) a breach of the duty; 3) causation; and 4) resulting damages. See McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir.1997); see also Fleet Bank v. Pine Knoll Corp. ., 290 A.D.2d 792, 736 N.Y.S.2d 737, 741 (N.Y.App.Div.2002) (claimant must show that a duty of care existed to state a cause of action for negligent misrepresentation).

[4] Under New York law, an insurance broker is in an agency relationship with the insured, and not the insurance carrier. In Am. Motorists Ins. Co. v. Salvatore, 102 A.D.2d 342, 476 N.Y.S.2d 897 (N.Y.App.Div.1984), the Appellate Division addressed the difference between an insurance agent and a broker. Salvatore found that: "It has been long recognized in this state [New York] that there is a distinction between insurance agents and brokers. The former acts as agent of an insurance carrier and the latter appears as representative of the insured." Salvatore, 476 N.Y.S.2d at 900 (internal citations omitted). The issue was again revisited in Evvtex Co., Inc. v. Hartley Cooper Assoc. Ltd., 911 F.Supp. 732 (S.D.N.Y.1996), where the district court reiterated that: "[t]he courts in New York have long held that insurance brokers act as agents on behalf of an insured and not the insurer." Evvtex, 911 F.Supp. at 738. The Evvtex court noted that the status of an insurance broker, as agent of the insured, is codified at § 2101 of the New York Insurance Law. That statute defines "insurance broker:"

An "insurance broker" means any person, firm,

association or corporation who or which for any compensation, commission or other thing of value acts or aids in any manner is soliciting, negotiating or procuring the making of an insurance or annuity contract or in placing risks or taking out of insurance, on behalf of an insured ....

Evvtex, 911 F.Supp. at 738, quoting N.Y. INS. LAW § 2102(c).

In this case, Highlands is the insurer, and Silver Car is the insured. PRG was the insurance broker. Therefore, PRG, as the insurance broker, was in an agency relationship with Silver Car (the insured) and not Highlands (the insurer).

There is a limited exception to the general rule that an agency relationship does not exist between a broker and insurer. A broker does owe an insurer a limited fiduciary obligation with respect to the handling of funds received from the insured. The New York Insurance Law provides that both an insurance broker and agent owe their principles a fiduciary duty with respect to the handling of funds received or collected.

Every insurance agent and every broker acting as such in this state shall be responsible in a fiduciary capacity for all funds received or collected as insurance agent or insurance broker, and shall not, without the express consent of his or its principal, mingle any such funds with his or its own funds or with funds held by him or it in any other capacity.

*6 N.Y. INS. LAW § 2120(a). "In the broker's fiduciary capacity, it holds premiums collected by its insured to be forwarded to the insurance company as an agent of the insurer." Evvtex, 911 F.Supp. at 739. Since the funds collected by a broker from the insured are intended for the insurer, § 2120 has been interpreted to extend a broker's fiduciary duties with regard to the collection of funds to insurers, in addition to insureds. See Evvtex, 911 F.Supp. at 739.

This exception, however, relates only to the receipt and collection of funds imposed by § 2120. The narrowness of this exception is evident from the fact that both insurance brokers and agents owe a duty of care to their respective principles only to matters specifically entrusted to the broker or agent. They do not owe an affirmative duty to provide general advice or direction. In Murphy v. Kuhn, 90

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *6 (S.D.N.Y.))

N.Y.2d 266, 660 N.Y.S.2d 371, 682 N.E.2d 972 (N.Y.1997), an insured obtained automobile coverage that met his specifications from his insurance agent, with whom he had a long-standing relationship. After an accident, the insured then sued his agent for professional negligence on the theory that the agent had an affirmative obligation to advise him to obtain additional coverage beyond that which he had requested. The New York Court of Appeals found that the insured could not state a cause of action for professional negligence against his agent as the parties had only a consumer-agent insurance placement relationship. The court found that in spite of the parties' long-standing relationship, no "special relationship" existed between the parties that could impose a duty of care on the agent beyond that of following the insured's instructions of placing the requested insurance. See Murphy, 90 N.Y.2d at 271, 660 N.Y.S.2d 371, 682 N.E.2d 972; see also St. Paul Fire and Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd., 976 F.Supp. 198, 204 (S.D.N.Y.1996) ("An ordinary relationship of broker to insurer does not by itself, give rise to a 'special relationship" ' that creates a duty of care).

Relying upon the holding in Murphy, the Court of Appeals four years later found that an insured may not state a claim against an insurance agent for professional malpractice. In Chase Scientific Research Inc. v. NIA Group, Inc., 96 N.Y.2d 20, 725 N.Y.S.2d 592, 749 N.E.2d 161 (N.Y.2001), the Court of Appeals found that since neither a broker nor agent are required to engage in extensive specialized education or training, nor bound by a standard of conduct for which they might be disciplined, they are not considered "professionals," in that they generally cannot be sued for professional malpractice. See Chase Scientific Research, 96 N.Y.2d at 30, 725 N.Y.S.2d 592, 749 N.E.2d 161. The court relied upon its earlier holding in Murphy, and reaffirmed that "an insurance agent has a common-law duty to obtain requested coverage, but generally not a continuing duty to advise, guide or direct a client based on a special relationship of trust and confidence." Id., citing Murphy, 90 N.Y.2d at 273, 660 N.Y.S.2d 371, 682 N.E.2d 972.

*7 In this case, Highlands attempts to place a duty of care on PRG beyond that of merely handling funds held in trust from Silver Car. Highlands'

alleges, inter alia, that PRG breached its duty to Highlands when: (1) PRG failed to "exercise reasonable care in hiring and supervising employees, whom they knew or should have known were dishonest;" (2) PRG failed to "have reasonable safeguards to protect against dishonest acts of employees;" and (3) PRG failed to "reasonably or adequately take steps to prevent or discover fraudulent claims and claims practices." Complaint at ¶¶ 126c-d, f. Notably absent from Highlands' complaint is any allegation that PRG failed to obtain the requested insurance policies or mishandled proceeds held in trust from the insured. Highlands' generalized allegations that PRG did not exercise reasonable care are an attempt to stretch PRG's duty of care to Highlands beyond that allowed under New York law. As a matter of law, Highlands cannot maintain either a negligence or breach of fiduciary duty cause of action against PRG because it cannot show that the broker-insurer relationship gave rise to a duty of care broad enough to cover the allegations in the complaint. Therefore, PRG's motion to dismiss Counts VII (Negligence) and IX (Breach of Fiduciary Duty) of the complaint is hereby granted.

### 4. Unauthorized Agency

[5] Highlands contends that by letter dated December 21, 2000, it revoked and terminated the authority of PRG to act on behalf of Highlands with respect to the policies. Highlands contends that despite this notification, PRG continued to purport to act on behalf of Highlands by holding itself out as Highlands' broker and continuing to issue certificates of insurance to Silver Car drivers under the policies.

As noted earlier, PRG's agency relationship with Highlands is limited in scope, and relates only to the procurement of requested policies and the handling of funds received from Silver Car. The basis by which Highlands alleges that PRG unlawfully held itself out as Highlands' agent after December 21, 2000, is PRG's actions of issuing certificates of insurance to drivers under the Silver Car policies after that date. See Complaint at ¶¶ 66, 132b. However, when PRG issued the certificates of insurance, it was doing so as the agent of Silver Car (the insured), to whom it owed a duty of care. See Salvatore, 476 N.Y.S.2d at 900 (broker owes a duty of care to the insured, not the insurer); See also Evvtex, 911 F.Supp. at 738. Highlands does not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *7 (S.D.N.Y.))

allege that the certificates of insurance were for new policies outside of the original 13 that Highlands had agreed to insure. Rather, the certificates of insurance were issued for existing policy holders under the original Silver Car policies, and issued in accordance with PRG's obligations to the Silver Car. Therefore, as a matter of law, PRG's actions do not constitute unauthorized agency as to Highlands. Consequently, PRG's motion to dismiss Count VIII (Unauthorized Agency) is granted.

### 5. Breach of Contract

**\*8** Highlands alleges that PRG breached the contract. PRG, on the other hand, contends that Highlands has not sufficiently stated a cause of action for breach of contract because Highlands has only alleged a breach in conclusory language, without identifying the purported contract, or identifying the terms of the contract that Highlands claims were breached.

Federal Rule of Civil Procedure 8(a) generally governs the pleading standards of a complaint. Rule 8(a) requires only that a party assert "a short and plain statement of the claim showing that the pleader is entitled to relief, and ... a demand for judgment[.]" Fed.R.Civ.P. 8(a). In a cause of action for breach of contract, a plaintiff must allege: 1) the existence of a contract; 2) plaintiff's performance of the contract; 3) a breach by the defendant; 4) and resulting damages. See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir.1994). A breach of contract claim will be dismissed, however, as being "too vague and indefinite," where the plaintiff fails to allege, in nonconclusory fashion, "the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated[.]" Sud v. Sud, 211 A.D.2d 423, 621 N.Y.S.2d 37, 38 (N.Y.App.Div.1995).

[6] Here, the complaint alleges that PRG breached "the obligations and duties ... under the contract of insurance[.]" Complaint at ¶ 120. However, Highlands does not allege in the complaint that PRG was a signatory, or in any other way, a party to the Silver Car policies. Rather, according to the complaint, PRG was responsible for underwriting the policies between Highlands and Silver Car. See Complaint at ¶¶ 21-22. Highlands may not hold PRG liable for breaching a contract to which it was

not a party. See e.g., Cruikshank & Co. v. Sorros, 765 F.2d 20, 26 (2d Cir.1985) ("[appellant], not a party to the contract at issue, cannot be found liable for damages resulting from its breach, notwithstanding his status as an agent of one of the parties in breach.")

Further, Highlands' efforts to turn the September 15, 2000 letter it sent to defendants into an enforceable contract is equally unavailing. Highlands contends that on September 15, 2000, it sent a letter to defendants informing them that Highlands would insure no additional Silver Car members under the last two policies, and that PRG in turn agreed that it would issue no new certificates of insurance under these policies. See Complaint at ¶¶ 61, 120f.

An agreement that lacks consideration is not enforceable. See Roth v. Isomed, Inc., 746 F.Supp. 316, 319 (S.D.N.Y.1990) ("[c]onsideration is a necessary ingredient for an enforceable contract.") Consideration requires either a benefit to the promisor or a detriment to the promisee. See Ball v. SFX Broadcasting Inc., 236 A.D.2d 158, 665 N.Y.S.2d 444, 446 (N.Y.App.Div.1997). Even assuming Highlands' allegations as true, which this court must on a motion to dismiss, this letter does not create a separate enforceable contract between Highlands and PRG. Essentially, Highlands and PRG both promised not to act. However, neither received a benefit or detriment for Highlands' promise not to insure additional Silver Car members, nor for PRG's promise not to issue new certificates under the policies. The September 15 letter agreement is therefore unenforceable as it is not supported by consideration. Consequently, PRG's motion to dismiss Count VI (Breach of Contract) is granted.

### 6. Conversion

**\*9** [7] Highlands contends that PRG and Blessinger have in their custody a data tape that contains information about the drivers covered by the Silver Car policies. Highlands argues that it has an ownership right to the data tape, and that defendants refuse to return it. PRG contends that Highlands cannot state a claim for conversion because Highlands is claiming a property interest in intangible property.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *9 (S.D.N.Y.))

Page 41

A plaintiff stating a claim for conversion must establish "legal ownership of a specific identifiable piece of property and defendants' exercise of dominion over or interference with the property in defiance of plaintiffs' rights." Gilman v. Abagnale, 235 A.D.2d 989, 653 N.Y.S.2d 176, 177 (N.Y.App.Div.1997), quoting Ahles v. Aztec Enters., Inc., 120 A.D.2d 903, 502 N.Y.S.2d 821, 822 (N.Y.App.Div.1986). However, under New York law, a claim for conversion must be for tangible property, as a claim for intangible property is not actionable. See Rao v. Verde, 222 A.D.2d 569, 635 N.Y.S.2d 660, 661 (N.Y.App.Div.1995); MBF Clearing Corp. v. Shine, 212 A.D.2d 478, 623 N.Y.S.2d 204, 206 (N.Y.App.Div.1995).

Here, the data tape was never Highlands' property. Rather, Highlands contends that PRG compiled information on Highlands' behalf, and then put that information on a tape that PRG already owned. It is the information that PRG compiled over which Highlands asserts a property interest, not the physical data tape on which the information is stored. See Rao, 635 N.Y.S.2d at 661. However, this information is intangible property, and Highlands cannot state a claim under New York law for conversion of intangible property. Consequently, defendants' motion to dismiss Count X (Conversion) is granted.

### 7. New York General Business Law § 349(a)

[8] Highlands argues that defendants violated the New York General Business Law § 349(a) ("GBL") by engaging in deceptive acts. Section 349 of the GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state [.]" N.Y. GEN. BUS. LAW § 349(a). Fundamentally, § 349 is a consumer protection device. A plaintiff must not only allege that the defendants engaged in deceptive acts or practices, but also that the conduct was consumer oriented. See New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 770 (N.Y.1995). Consequently, the New York Court of-Appeals held that "[p]rivate contract disputes, unique to the parties ... would not fall within the ambit of the statute." Id.; Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, 744 (N.Y.1995). "[T]he gravamen of the complaint must

be consumer injury or harm to the public interest ." Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988).

In this case, Highlands alleges only a private injury, namely that defendants conspired to fraudulently induce Highlands into insuring Silver Car's members. Nothing about the complaint alleges a consumer injury or harm to the public interest. Rather, the complaint is for damages based upon the Silver Car policies Highlands claims it was fraudulently induced to issue. The damages are purely private in nature and relate only to monetary losses that Highlands allegedly suffered. Consequently, defendants' motion to dismiss Count XI (GBL § 349(a)) of the complaint is hereby granted.

### 8. Breach of Claims Handling Duty

*10 Lastly, Highlands alleges that PCS breached what Highlands calls a "claims handling duty." Highlands bases this claim on the theory that PCS owed Highlands both contractual and fiduciary obligations, and that PCS breached those obligations. PCS argues that, as a matter of law, claims handlers do not owe insurers a "claims handling duty."

The New York courts, or federal courts applying New York law, have not specifically addressed the issue of whether a claims handler owes an insurer a fiduciary duty. However, New York courts have examined whether a fiduciary relationship exists between an insured and an insurer. In Rabouin v. Metr. Live Ins. Co., 182 Misc.2d 632, 699 N.Y.S.2d 655 (N.Y.Sup.Ct.1999), the New York Supreme Court found that the plaintiff policyholder of an insurance contract could not state a claim against his insurer for breach of fiduciary duty because no such duty existed between the insured and the insurer. See Rabouin, 699 N.Y.S. at 657. The court acknowledged that, under certain circumstances, an insured's relationship with an insurer might transform into a fiduciary relationship. However, the court found that where the plaintiff has only alleged an "ordinary arm's length relationship created by the payment of premiums to [the insurer] in return for a policy of insurance[,]" there was no fiduciary obligation on the part of the insurer. Id.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *10 (S.D.N.Y.))

Further, in Batas v. Prudential Ins. Co. of Am., 281 A.D.2d 260, 724 N.Y.S.2d 3 (N.Y.App.Div.2001), the Appellate Division, as well, found no fiduciary relationship between the plaintiff insureds and their insurer. There, the insureds were each hospitalized for serious emergency medical conditions. Their insurance carrier, however, only authorized limited time for hospitalization pursuant to its review of the "Milliman & Robertson Guidelines." The insurance carrier made this determination despite the fact that the guidelines were contrary to the recommendations provided by the insureds' primary care physicians calling for lengthier hospitalization. The insureds brought an action against their insurance carrier, alleging, inter alia, a breach of fiduciary duty for failing to disclose to the insureds that the insurer would make determinations based on a review of the Milliman & Robertson Guidelines, even if the guidelines conflict with the medical opinion of the insureds' primary care physicians. See Batas, 724 N.Y.S.2d at 9-10.

The Batas court found, however, that no fiduciary relationship existed between the insureds and the insurer. The court found no evidence of "overreaching" or "special circumstances" between the parties that might lead to the conclusion that anything other than an arm's length association existed between the insureds and the insurer. See Batas, 724 N.Y.S.2d at 7. The court noted that generally parties to a contract of insurance do not owe each other a fiduciary obligation:

Plaintiffs make no showing that their relationship with defendants is unique or differs from that of a reasonable consumer and offer no reason to depart from the general rule that the relationship between the parties to a contract of insurance is strictly contractual in nature. No special relationship of trust or confidence arises out of an insurance contract between the insured and the insurer; the relationship is legal rather than equitable.

*11 Batas, 724 N.Y.S.2d at 7. Consequently, the court found no fiduciary relationship between the insureds and their insurer.

[9] In this case, PCS is a claims handler, and Highlands is the insurer. Highlands has not sufficiently alleged facts to support a claim that its relationship with PCS was one of such trust and confidence that a fiduciary duty existed. The parties merely had an arm's length association, and without

more, no fiduciary obligation is created. Nothing about the nature of the relationship between a claims handler and insurer involves a level of trust or confidence that would inherently lead to a fiduciary duty on behalf of the claims handler. If a fiduciary relationship does not generally flow between an insurer and an insured, then certainly it does not generally flow between a claims handler and an insurer.

Further, Highlands' allegation that PCS breached their contract cannot support a breach of fiduciary duty. [FN5] A breach of contract, by itself, does not create a fiduciary duty. "Rather, the focus is on whether a noncontractual duty was violated.... Thus, unless the contract creates a relation, out of which relation springs a duty, independent of the mere contract obligation, though there may be breach of the contract, there is no tort, since there is no duty to be violated." Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 529 N.Y.S.2d 279, 282 (N.Y.App.Div.1988). As discussed above, Highlands and PCS had an arm's length association, to which no fiduciary duty arose. Therefore, PCS's motion to dismiss Count XII (Claims Handling Duty) is granted.

FN5. Highlands' breach of contract allegations against PCS are solely contained within the "claims handling duty" cause of action and are not alleged as a separate and independent count for breach of contract.

B. Highlands' Motion to Dismiss the Counterclaims

1. Venue as to Third Party Defendant King

[10] Highlands and King assert that venue is improper as to the counterclaims against King in this district, as King lives in New Jersey, works in New Jersey, and works for a company whose principal place of business is in New Jersey (Highlands). This argument has no merit. Highlands chose to file its complaint in this district. In its complaint, Highlands asserted that venue is proper pursuant to 28 U.S.C. § 1391(a) because "a substantial part of the events giving rise to the claims in this action occurred in this judicial district." Complaint at ¶ 11; see also 28 U.S.C. § 1391(a). Defendants admitted this allegation in their Answer. See PRG's Answer at ¶ 11. Defendants then filed counterclaims against Highlands and third party defendant King.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *11 (S.D.N.Y.))

Defendants' counterclaims as to Highlands are compulsory as they "aris[e] out of the transaction or occurrence that is the subject matter of the opposing party's [Highlands'] claim[.]" Fed.R.Civ.P. 13(a). The counterclaims against King are identical to those asserted against Highlands and involve the same transaction or occurrence. Therefore, venue is also proper in this district as to King pursuant to 28 U.S.C. § 1391(a), since a substantial part of the events giving rise to the counterclaims against him occurred in this district.    [FN6] Consequently, Highlands' motion to transfer venue as to the counterclaims against King is hereby denied.

> FN6. For the same reasons, venue would also be proper in this district under 28 U.S.C. § 1391(b).

### 2. RICO and RICO Conspiracy

**\*12  [11]**  Similar to plaintiff Highlands' complaint, defendants as well allege violations of the federal RICO statute in their counterclaims. Specifically, defendants contend that Highlands and King devised a scheme to defraud defendants by inducing PRG to market Highlands' insurance so that Highlands and King could gain a dominant market share in the livery insurance market. Highlands and King, on the other hand, contend that defendants have failed to sufficiently allege that any statements they made were false.

As noted earlier, a fraud claim consists of five elements: 1) a representation of material fact; 2) that was false; 3) scienter; 4) reliance by the plaintiff; and 5) injury. See Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 578 N.Y.S.2d 128, 585 N.E.2d 377, 378-79 (N.Y.1991); Giffune v. Kavanagh, 302 A.D.2d 878, 753 N.Y.S.2d 784, 784 (N.Y.App.Div.2003). Likewise, as discussed earlier, fraud must be pled with particularity. See Fed. R. Civ. P. 9(b).

Defendants allege that around December 19, 2000, Highlands wrongfully sent notices of nonrenewal to all of Silver Car's members under the insurance policies, and that defendants did so to disrupt PRG's business. See Countercl. at ¶¶ 35-36. Defendants further contend that around December 21, 2000, Highlands sent a letter to PRG and Aramarine purporting to revoke their authority to bind coverage and to issue certificates of insurance to Silver Car members. Defendants contend that this purported revocation of authority is in direct violation of a June 1999 Letter Agreement between Highlands and Aramarine, as well as the terms of the policies themselves. See id. at ¶ 39, 753 N.Y.S.2d 784.

Defendants additionally contend that on February 28, 2001, Highlands notified the New York State Department of Motor Vehicles ("DMV") that PRG's authority to act on behalf of Highlands was revoked, that this action was also in breach of the June 1999 agreement, as well as in breach of the terms of the policies.    See id. at ¶ 47, 753 N.Y.S.2d 784. Consequently, defendants contend that the DMV refused to accept evidence of insurance of Silver Car members submitted by PRG, and that certain vehicles of Silver Car's members were subject to being impounded for operating without valid insurance. See id. at ¶ 48, 753 N.Y.S.2d 784. Defendants further contend that Highlands fired PRG as its servicing agent to the DMV's electronic database system of reporting insurance. Defendants contend that this was done without notice and, in any event, in violation of a TRO issued by the New York Supreme Court. As a result of this revocation, defendants argue that the vehicles of certain Silver Car insured drivers were consequently towed for lack of evidence of insurance. See id. at ¶ 52, 753 N.Y.S.2d 784.

Defendants further argue that on February 28, 2001, Highlands advised Premium Payment Plan ("PPP"), the company that provided financing of premiums to Silver Car's members, that PRG no longer had a business relationship with Highlands, and that as a result, PPP declined to continue to provide financing of premiums. See id. at ¶ 55-57. Defendants contend that Highlands' statement to PPP in this regard was false. See id. at ¶ 112, 753 N.Y.S.2d 784. Defendants argue that Highlands then filed the instant civil action against defendants alleging that defendants engaged in RICO violations, and that the allegations in the complaint are false, misleading, and intended to harm defendants in their business. See id. at ¶¶ 60-61, 118.

**\*13** Defendants also contend that around the time Highlands' complaint was filed, Highlands appointed NPA Associates, Ltd. ("NPA") as its exclusive managing agent for its New York livery business. See id. at ¶ 58, 753 N.Y.S.2d 784.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *13 (S.D.N.Y.))

Defendants argue that NPA held a meeting in which several of Highlands' sub-brokers were invited. At that meeting, defendants contend that a representative from NPA made disparaging comments about defendants. For example, defendants contend that the NPA representative told the sub-brokers that Highlands would file a "RICO case to choke a horse" and that there would be "news media like you have never seen." Defendants contend that these statements were made for the purpose of causing harm to defendants' business and reputation. See id. at ¶¶ 63-66, 117, 120-25.

Defendants contend that by cancelling the Silver Car policies, Highlands planned to destroy PRG's market and subsequently recapture PRG's customers and then charge higher premium rates. See id. at ¶ 110, 753 N.Y.S.2d 784.    Defendants further contend that as a result of Highlands' actions, sub-brokers have refused to do business with PRG. See id. at ¶ 131, 753 N.Y.S.2d 784. Defendants further contend that Silver Car and Aramarine entered into a "secret" settlement agreement with Highlands around April 29, 2001 which provides for early termination of the policies. See id. at ¶ 68, 753 N.Y.S.2d 784.

These allegations are woefully inadequate to support a claim of racketeering activity based upon fraud. Specifically, defendants have presented no factual support for their theory that Highlands, at the time it executed the Silver Car policies, did not intend to follow through with its obligations under the agreement. Highlands' notices of nonrenewal and all other subsequent actions it took to extract itself from its obligations on the policies, at most, state a claim for breach of contract, not for fraud. However, nothing about the statements made by the NPA representative indicate that Highlands, at the time it contracted, intended to breach the contract.

Nor does the mere fact that Highlands filed a civil action in this Court, or the fact that Highlands eventually settled with two of the defendants, leads to the conclusion that Highlands and King intended to destroy, and subsequently recapture for its own benefit PRG's business. Nothing about the circumstances or statements that defendants have alleged give rise to an inference of fraudulent intent. Defendants' allegations that Highlands and King intended to destroy defendants' business are nothing more than conclusory statements and bald assertions,

which are inadequate to satisfy Rule 9(b)'s heightened pleading standard. As defendants' allegations do not state a claim for fraud, and since the criminal racketeering activity alleged is fraud, defendants fail to state a claim for a RICO violation. Consequently, Highlands' motion to dismiss Counterclaims I (RICO) and II (RICO Conspiracy) is hereby granted.  [FN7]

FN7. Defendants' allegations in their counterclaims as to third party defendant King relate only to King's alleged participation and involvement in the RICO conspiracy. Since this Court is dismissing the RICO counterclaims, this Court will also dismiss King from the case on that same basis.

3. Declaratory Judgment and Injunctive Relief

*14 [12] Defendants seek a declaratory judgment that, inter alia, Highlands' notices of nonrenewal were invalid, Highlands is bound to provide coverage on the policies through March 1, 2003, and that Highlands' revocation of PRG's authority to issue certificates of insurance was in breach of the policies. Similarly, defendants also seek a preliminary and permanent injunction restraining Highlands from, inter alia, canceling or terminating the policies prior to March 1, 2003, and refusing to recognize as valid the certificates of insurance issued by PRG pursuant to the Silver Car policies. Further, defendants allege that Highlands breached the contracts in bad faith.

To have standing to bring suit, a party must allege an injury in fact to a preexisting, legally protected interest. The injury must be: "(a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." Altman v. Bedford Cent. School Dist., 245 F.3d 49, 69-70 (2d Cir.2001), quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Therefore, a claimant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Altman, 245 F.3d at 70, quoting Valley Forge Christian College v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

Here, defendants readily admit that they were not a party to either the Silver Car policies or any agreement discussing the terms of Highlands'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 35439, *14 (S.D.N.Y.))

obligations under the policies. See Countercl. at ¶ 24. Defendants nevertheless contend that they have standing to enforce the contract as third-party beneficiaries to the agreement.

"A person who is not a party to the contract may bring an action for breach of contract if she or he is an intended beneficiary, and not merely an incidental beneficiary of the contract." Cauff, Lippman & Co. v. Apogee Finance Group, Inc., 807 F.Supp. 1007, 1020 (S.D.N.Y.1992). "Although a third party need not be specifically mentioned in the contact [sic.] before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement." In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F.Supp. 712, 733 (S.D.N.Y.1989); see also Port Chester Electrical Constr. Corp. v. Atlas, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983, 986 (N.Y.1976). "Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract." In re Gulf Oil/Cities Service Tender Offer Litig., 725 F.Supp. at 733.

Defendants do not allege that the Silver Car policies expressly included a provision to pay broker fees to PRG. Rather, defendants contend that the June 1999 Letter agreement, the Silver Car policies, and various correspondence signed by Highlands, when read in combination, confer a third-party beneficiary right upon PRG. However, as indicated above, the face of the agreement itself must show the intent to benefit PRG. Defendants have not alleged that the agreement itself indicates such an intent. Therefore, PRG is not an intended third-party beneficiary to the agreement and it has no standing to raise a claim or seek declaratory or injunctive relief based upon Highlands' obligations to Silver Car that were detailed in that agreement. Consequently, Highlands' motion to dismiss Counterclaims III (Declaratory Judgment) and IV (Injunctive Relief) is granted.

4. New York General Business Law § 349(a)

*15 [13] Defendants allege that Highlands and King violated GBL § 349(a) by making misrepresentations and omissions of material fact for the purpose of inducing PRG to assist Highlands in achieving a dominant position in the livery insurance market in New York. As discussed earlier,

GBL § 349 does not cover private disputes that are unique to the parties. See Oswego Laborers' Local 214, 623 N.Y.S.2d 529, 647 N.E.2d at 741. Rather, a party must allege consumer injury or harm to the public. See Azby Brokerage, 681 F.Supp. at 1089 n. 6. Here, defendants have not alleged in their counterclaims consumer injury or harm to the public. Consequently, Highlands' motion to dismiss Counterclaim VIII (GBL § 349(a)) is hereby granted.

Conclusion

Defendants' motion to dismiss is GRANTED in its entirety. Plaintiff's complaint is therefore dismissed in its entirety. [FN8] Highlands' motion to transfer venue as to the counterclaims against third party defendant King is DENIED. Highlands' motion to dismiss the counterclaims is GRANTED with respect to Counterclaims I-V, and VIII. [FN9] Third party defendant King is dismissed from the case.

FN8. The only claim in Highlands' complaint that defendants did not move to dismiss is Count V (Rescission). That count, however, is directed only at Silver Car. As noted earlier, both Silver Car and Aramarine are no longer parties to this case, and all counts against them are therefore dismissed as moot.

FN9. Defendants voluntarily withdrew Counterclaim V (Breach of Contract and Bad Faith). See Defts' Opp. to Counterclaim and Third-Party Defts' Mot. to Dismiss at 2.

2004 WL 35439 (S.D.N.Y.), RICO Bus.Disp.Guide 10,604

END OF DOCUMENT

